28 So.2d 441

HAKE et al. v. AIR REDUCTION SALES CO.

No. 38033.

July 31, 1946.

Rehearing Denied Nov. 12, 1946.

Kelleher, Hurley & Kohlmeyer, of New Orleans, for appellant.

McLoughlin & West, of New Orleans, and John E. Fleury, of Gretna, for appellee.

HAMITER, Justice.

The galvanizing plant of the Hake Galvanizing Works, situated near the Town of Harvey in Jefferson Parish, was destroyed by fire during the evening of June 22, 1943, as a result of ignited acetylene gas escaping from a cylinder, located in a storeroom on the premises, which had been purchased from the Air Reduction Sales Company of New Orleans. Of the damage sustained, which concededly was $35,303.08, the Allemania Fire Insurance Company paid $5,000, the limit of its policy of fire insurance covering the property; and it was subrogated in writing to the rights of the owner to the extent of that payment.

On or about December 17, 1943, the Hake Galvanizing Works, a copartnership, was dissolved; and the three partners comprising it acquired through duly executed assignments all of the assets thereof, including its claims, in the proportion of an undivided one-third to each.

Thereafter, the assignees instituted this suit against Air Reduction Sales Company to recover judgment for the damages sustained from the fire by the Hake Galvanizing Works, subject to recognition of the subrogation in favor of the Allemania Fire Insurance Company in the sum of $5,000. The theory of the action is that the acetylene cylinder delivered to its premises by defendant was defective and that the fire which damaged the plant originated as a result of the defect.

On the question of defendant's negligence, the allegations of the petition are:

"That the flame came first from one of the safety fuse plugs in the top of said cylinder, due to causes well known to defendant, its agents and employees, but unknown to petitioners, unless they be one or more of the causes hereinafter set forth, plaintiffs reserving the right to show any and all items of negligence on the part of defendant, its agents and employees, which may develop in the trial of this cause; that defendant, its agents and employees, knowing the contents and concentration of said cylinder and the dangerous and explosive nature thereof, were charged with the highest degree of care in the preparation and delivery of this exceedingly dangerous instrumentality, and if due and ordinary care had been observed by defendant, its agents and employees, the fire would not have occurred; that therefore plaintiffs are entitled to judgment under the doctrine of res ipsa loquitur even if no specific item of negligence on the part of the defendant, its agents and employees, can be shown; and that the Hake Galvanizing Works, its agents and employees, were not guilty of any contributory negligence.

"The plaintiffs believe, and therefore allege, at the same time showing that plaintiffs should not be bound by or restricted to

these allegations, that the fire was caused by a defective fuse plug which blew out, releasing the acetylene in said cylinder; that the acetylene immediately filled the storeroom, flowed out of the door, ignited at the nearest flame which was approximately twenty feet outside the storeroom door, and flared back into the storeroom in a blaze that could not be quenched; that defendant, its agents and employees, were guilty of negligence in the following particulars, which are not exclusive:

"1. In inserting a defective fuse plug in the cylinder in question.

"2. In charging or filling said cylinder improperly, causing sufficient pressure to blow out said fuse plug, even if said fuse plug was not defective.

"3. In failing to protect the valve and fuse plugs in the top of said cylinder by a removable metal cap.

"4. In failing to detect the dangerous condition of the said fuse plug.

"5. In failing to warn the Hake Galvanizing Works, its agents or employees, of the danger from said cylinder."

The defendant, in its answer, denied specifically the allegations of negligence. Affirmatively, it averred that the acetylene cylinder complied in all respects with the safety regulations of the National Board of Fire Underwriters and the Interstate Commerce Commission, and that it was in a safe and proper condition on the date of delivery, which preceded the occurrence of

the fire by 45 days, this having been demonstrated by a thorough and careful checking, inspecting and testing at that time. Alternatively, defendant pleaded contributory negligence.

After trial there was judgment in favor of plaintiffs for $35,303.08, with recognition of the subrogation in favor of the Allemania Fire Insurance Company for $5,000. Defendant appealed.

The destroyed building of the galvanizing plant consisted of concrete floors, wood columns, sheet metal siding, and a wood roof covered with tar paper. Within the building were two rooms separated by a sheet metal wall that contained a single door opening but no door. One of these rooms used principally as a storeroom or warehouse, had dimensions of approximately 17 feet by 28 feet; the other, being the main part of the plant, was several times larger. In the latter room, located about 15 feet from the storeroom doorway, was a galvanizing kettle or pot heated by means of a gas furnace constructed of brick, magnesium insulation and steel sheeting.

About 6:20 o'clock of the evening of June 22, 1943, a sudden, loud, sharp, hissing noise, similar to that made by the escaping of air under pressure, attracted the attention of several of the company employees who were working in the main part of the plant. Rushing to the storeroom from which the sound came, they observed a flame striking the wood roof of the building and spouting from the top of an acety-

lene gas cylinder which stood in an upright position within the storeroom about two inches from the inside wall and some 10 feet from the above-mentioned doorway. The manager was notified and the fire department summoned; but all efforts to extinguish the blaze proved futile.

Acetylene, with which the cylinder was charged, is a hydrocarbon gas, prepared through the process of introducing carbide into water. It is widely used in industry in oxygen-acetylene welding and cutting. The gas, when mixed with oxygen in proper proportions, provides an intense heat at the tip of a cutting torch or welding instrument of several thousand degrees Fahrenheit. Recognizing that acetylene in a free state is susceptible to dissociation with a consequent generating of terrific heat, resulting possibly in a violent explosion, the Interstate Commerce Commission has promulgated regulations and specifications for the design, construction and manufacture of metal containers needed in its transportation and use.

The cylinder causing the destruction in the instant case was manufactured in 1920 (23 years prior to the fire) in accordance with those regulations and specifications. Having a shell of approximately one-eighth inch low carbon steel, it was fitted at the top with a valve and with two fuse plugs (one on each side of the valve) and at or near the base with three fuse plugs. The plugs, inserted in the cylinder more than six years before the fire, were small threaded bolts containing cores of what is called "Woods Metal". These cores, a soft alloy, were designed to melt at a temperature in excess of 220 degrees Fahrenheit, functioning as safety valves and releasing the gas in the event of its dissociation and consequent generation of extreme heat, thereby obviating a possible violent explosion and the shattering of the steel wall of the cylinder. Inside the cylinder were a porous filler and a solvent known as acetone, these serving together to prevent the introduced acetylene gas from becoming dissociated and to render the cylinder relatively free of hazard when used and handled under reasonable and ordinary conditions.

On May 6, 1943, such cylinder (which had been in service for many years) was recharged with acetylene gas by defendant and given the usual test for leaks, and on the day following it was delivered by defendant's truck and driver to the premises and storeroom of the galvanizing plant. There it remained continuously until the escaping of the gas therefrom and the occurrence of the fire on June 22, 1943.

The evidence preponderately shows, and defense counsel apparently concede, that the gas escaped from the cylinder by reason of the sudden blowing out of the core of one of the fuse plugs. But the exact cause of the blowout, together with the igniting of the gas, is not revealed by the record.

Plaintiffs theorize that the fuse plug "let go" because of some defect in it unknown to them, and that the gas became ignited either by some external force, such as the flame under the galvanizing pot in the adjoining room or an electrical short circuit to which the gas travelled, or by a static spark created from friction as the acetylene flowed through the orifice of the cylinder. In support of this theory the testimony of two experts was offered. Their opinions, however, were challenged and disputed by defendant's two experts.

Defense counsel, on the other hand, suggest several probabilities for the cause of the escaping gas and the fire, all being predicated on alleged negligent acts of the employees of the Hake Galvanizing Works. But they say that "one emergent probable cause of the fire stands out in bold relief", they referring to that detailed in the following paragraph found in their brief: "We submit, therefore, in view of the background of slipshod and slovenly methods that prevailed at the Hake Galvanizing Plant in the handling of acetylene gas, S. T. Green, when he finished cutting on the pickling tank on the day of the fire, failed to completely extinguish the cutting torch; that the flame burned invisibly for some time and was projected against the wall of the cylinder involved herein, thereby setting in motion dissociation within the cylinder. The dissociation generated sufficient heat to both melt the fuse plug core and ignite the gas thereby released."

From the evidence adduced, it is highly unlikely that the gas was loosed and became ignited in the manner thus described. S. T. Green, according to his testimony, discontinued his cutting operations some six hours before the occurrence of the fire. He had been using the torch, attached by an accompanying hose to a cylinder of acetylene gas (not the one in question) and also to one of oxygen which were mounted on a hand truck, in burning a flange off the pickling tank stationed about 17 feet from the offending cylinder. When finished he shut off the torch and also the valves of the cylinders, and then wrapped the hose around the handles of the truck. Throughout the afternoon several of the employees (as well as Green) were in and out of the storeroom, securing tools and other equipment, and all testified that at no time did they observe fire or anything else unusual there. Had the torch continued to burn, as defense counsel suggest, surely their attention would have been directed to it either by the hissing noise or the odor of the flowing gas, if not the flame itself.

Since the record, therefore, contains no evidence disclosing the exact cause of the fuse plug's blowing out and of the igniting of the gas, it can only be concluded that plaintiffs have failed to prove any specific acts of negligence on the part of defendant. Nevertheless, they are entitled to recover herein if the case is controlled by the doctrine of res ipsa loquitur, invoked by them, and further if defendant has failed

to discharge the burden imposed on it by that doctrine.

Res ipsa loquitur, meaning "the thing speaks (for) itself", is a rule of evidence, the applicability of which is to be determined on the conclusion of the trial. Gerald v. Standard Oil Co. of Louisiana et al., 204 La. 690, 16 So.2d 233.

One of the leading and early cases in our jurisprudence involving the doctrine was Lykiardopoulo v. New Orleans & C. R. Light & Power Co., 127 La. 309, 53 So. 575, 576, Ann.Cas.1912A, 976. The decedent therein, for whose death damages were sought by his father, was scalded fatally in a boiler explosion in the power plant at which he worked. Regarding the doctrine the court said: " * * * In cases where the plaintiff cannot be expected to have any information as to the causes of the accident, whereas the defendant, on the contrary, must be assumed to be fully informed on the subject, and where the accident is of the kind which ordinarily do not occur when due care has been exercised, the rule of evidence is that the accident speaks for itself—res ipsa loquitur—that is to say, that a presumption of negligence arises from the fact itself of the accident. In such cases, the plaintiff not only need not allege the particular acts of omission or commission from which the accident has resulted, but need not even prove them. The accident itself makes out a prima facie case, and the burden is on defendant to show absence of negligence.

Res ipsa loquitur. That rule is of peculiar applicability in cases of boiler explosions. Thus, negligence may be inferred from the fact of the explosion of the boiler of the vessel, although the defendant is under no contract obligation to protect the plaintiff. * * *."

In the more recent case of Jones v. Shell Petroleum Corporation et al., 185 La. 1067, 171 So. 447, 449, the following comment was offered relative to the applicability of the rule:

"Where the thing which caused the injury complained of is shown to be under the management of defendant or his servants and the accident is such as in the ordinary course of things does not happen if those who have its management or control use proper care, it affords reasonable evidence, in absence of explanation by defendant, that the accident arose from want of care. 45 C.J. § 768, p. 1193.

\* \* \* \* \* \*

"While negligence is never presumed as a matter of law from the happening of an accident, the happening of the accident with its attendant circumstances may justify the inference of negligence. Thus, when the thing which produced the injury is under the control of the defendant or his servants and the injury would not have occurred unless negligence had been present in some form and the facts causing the injury are peculiarly within the knowledge of defendant and not equally accessible to plaintiff, the burden is on defendant to

explain the cause of the accident, if he desires to escape from the inference of negligence."

Relying on the Jones case, as well as on other decisions of this court, defense counsel argue in their brief that, "Before the doctrine may be applied, it is required by the courts in this and other jurisdictions that the defendant be in exclusive possession and control of the instrumentality which allegedly caused the accident." Then they show "that in the case at bar, the acetylene cylinder which the plaintiffs allege caused the fire, was in their exclusive possession and control for 45 days preceding the fire, namely, from May 7, until June 22, 1943, on which latter date the fire occurred."

While it is true that the possession test seems to have been employed in many of the cases in our jurisprudence to determine the applicability of the res ipsa loquitur doctrine, it is also true that there are other cases, involving a certain type of accident, wherein the matter of possession in the defendant was not an important consideration. Thus, in actions for damages resulting from exploding bottles of carbonated beverages and from leakage of drums of acid, the exclusive possession and control of the instrumentalities by the respective manufacturers is not a requirement. It is important though in an action of that type, and a condition precedent to the application of the doctrine, that the plaintiff prove freedom of fault on the part of all through whose hands the instrumentality passed after it left the manufacturer. When this proof is made, negligence of the defendant is inferred from the happening of the accident, and to escape liability it must overcome the inference. Some cases of this kind (one involving the escaping of a bung in a sulphuric acid drum while being transported by an independent drayman and four involving explosions of bottles of carbonated beverages in the possession of the plaintiffs) are the following: Motor Sales & Service, Inc. v. Grasselli Chemical Co. et al., 15 La.App. 353, 131 So. 623; Auzenne v. Gulf Public Service Co., La.App., 181 So. 54; Auzene v. Gulf Public Service Co., La.App., 188 So. 512; Lanz v. DeRidder Coca Cola Bottling Co., La.App., 3 So.2d 217; Meyers v. Alexandria Coca Cola Bottling Co., Ltd., La.App., 8 So.2d 737; Ortego et al. v. Nehi Bottling Works et al., 199 La. 599, 6 So.2d 677.

In principle, we are unable to distinguish the present case from the decisions of the group last above mentioned. Defense counsel attempt to draw a distinction by the fact that an acetylene cylinder contains a fuse plug (a safety device) whereas a bottle of carbonated beverage does not. In this connection they argue "that when a bottle of carbonated beverage explodes, despite the fact that it has been carefully handled, it does so because the bottle is itself defective and not because of the functioning of any safety device inherent in the structure of the bottle. * * * If

a bottle is dropped on a cement floor and explodes, no inference of a defect could be drawn. But a perfect bottle, not mishandled, will not explode, and even though it is out of the control of the defendant and in the plaintiff's refrigerator, an inference of negligence necessarily arises from the explosion itself when the plaintiff negatives misuse of the bottle." In attempting to draw the distinction, counsel overlook the fact that neither will a perfect acetylene cylinder "blow" a fuse plug, if kept in an ordinary and reasonable temperature and is not mishandled, even though it is out of defendant's control and possession. The fuse plug or safety device is designed to function only when the surrounding temperature is in excess of 220 degrees. At no time during the day of the fire in question, as shown by the record, did the temperature at defendant's plant exceed 95 degrees.

Since a making of the mentioned distinction is impossible, the cited authorities compel the conclusion that the res ipsa loquitur doctrine is controlling here, provided that plaintiffs have proved freedom of fault in the handling of the cylinder from the date of its delivery to the premises of the Hake Galvanizing Works.

The trial judge found as a fact, as his written reasons for judgment disclose, that on delivery the cylinder was placed in an upright position on the concrete floor of the storeroom, and there it remained, unused and in the same condition as when delivered, until the occurrence of the fire; and that at no time during that period was it given rough treatment or was otherwise mishandled. With this finding we agree; the record amply sustains it. Supplementary, it may be pointed out that no regulator or gauge (an instrument essential for its use) was ever placed on the cylinder, a circumstance that indicates non-usage.

This leaves for consideration only the question of whether defendant has discharged the burden of overcoming the inference that the accident arose from its negligence, its want of care. As to this feature of the case the evidence shows that the steel cylinders in which acetylene gas is sold and transported, all being made under Interstate Commerce Commission regulations, are recharged again and again. When empties are returned to defendant's establishment they are inspected and if mechanical defects appear, repaired. Then, after being weighed, they are ready for charging.

The acetylene gas, which is generated by feeding carbide into water, goes to a storage tank, to a compressor, and to a filling line, respectively. Placed along and connected to this line are the cylinders or containers, and from it they are filled. It contains an automatic gauge and a mechanically operated pop-off valve to prevent the insertion of excessive pressure. The maximum number of cylinders charged at one time is 160 (there are that many outlets in the line) and the minimum number is 100.

Following the charging, the cylinders are removed from the line, again weighed to determine their contents, are inspected, and, finally, are tagged to show the date of filling, the amount of gas contained in pounds and cubic feet, and the name of the employee inspecting them. The inspection is for the purpose of determining whether any leaks exist, and it is performed by applying soapy water around the valve and fuse plugs.

The cylinder involved in the fire, according to defendant's record, was recharged on May 6, 1943, with 254 cubic feet of gas, its capacity being 275 cubic feet. Thus, it did not contain excessive pressure when delivered the following day. Moreover, the conclusion is warranted that it was not in a leaky condition; no leak was discovered by defendant's employee when applying the soapy water test, and the workmen at the galvanizing plant, who made numerous trips daily to the storeroom, at no time detected the strong odor of escaping acetylene gas. In fact, one of the workmen passed through that room approximately 20 minutes before the fire occurred.

As concluded above, therefore, the escaping of the gas resulted from the sudden blowing out of a fuse plug. And this furnishes the question: Did that plug contain defects for which the defendant was responsible?

Fuse plugs, as before shown, are small threaded bolts containing a soft alloy

which melt or function ordinarily at a temperature exceeding 220 degrees Fahrenheit. Those in the offending cylinder, while it was on the premises of the galvanizing works, were never subjected to more than usual or regular temperature. But they had been in use or service, as parts of that cylinder, for more than six years. And this circumstance deserves particular notice because, as disclosed by the evidence, age and time have a deleterious effect on all mechanical parts and on metals, including the cores of fuse plugs. An official of the defendant company explained: "The effect of time and temperature on the type of fuse metal that we are using in these fuse plugs is to extrude the metal; and this is readily perceptible when examinations are being made, and when a plug shows an extrusion it is replaced * * *. In the case of an extrusion, a bump shows in the middle of this surface."

In view of this explanation the blowing out of the plug in the instant case can reasonably be attributed to a defect in the plug's core brought about by its lengthy service and use for more than six years. It may be true that the plug was inspected shortly before the delivery of the cylinder, at which time no extrusion was apparent, and that the defect was possible of detection only after the cylinder reached the premises of the galvanizing works. But considering the inherently dangerous nature of acetylene gas, and the further fact that defendant furnishes to the users (ex-

cept at their request) no instructions as to the inspection and handling of the cylinder, a very high degree of care is demanded of the defendant manufacturer in the preparation and distribution of its product. This care would include, in our opinion, not only a routine inspection of the container, with a change of a plug if an extrusion thereon be noticed, but also a regular replacement, on a time basis, of the several parts of the cylinder, especially the fuse plugs. This latter practice, according to the record, defendant does not follow.

That it is important to make regular and timely replacements of fuse plugs, assuming that their cores deteriorate with age, is well illustrated by the instant case. Here was a cylinder that stood upright in the galvanizing plant's storeroom for 45 days, unused, not mishandled, and apparently in good condition. The owner considered that it was harmless and would remain so indefinitely. But suddenly and unexpectedly, without the aid of external forces, the fuse plug blew. out.

As to what ignited the gas on its escaping from the cylinder, the record does not disclose and no one knows. But it is unnecessary to decide that issue of fact, for, with respect to it, negligence on the part of 'those at the galvanizing plant is negatived by the evidence.

Our conclusion, therefore, is that the doctrine of res ipsa loquitur is controlling in this case, and that the defendant has failed to overcome the inference that the

accident arose from its want of care or negligence.

For the reasons assigned the judgment is affirmed.