128 So.2d 660 (1961)
241 La. 288
Mrs. Cecelia LeBlanc DAY, Individually and as Natural Tutrix, etc.
v.
NATIONAL U. S. RADIATOR CORPORATION et al.
No. 45059.
Supreme Court of Louisiana.
March 20, 1961.
Rehearing Denied April 24, 1961.
*661 Watson, Blanche, Wilson, Posner & Thibaut, David W. Robinson, Baton Rouge, for defendant-appellant.
Sanders, Miller, Downing, Rubin & Kean, Wex S. Malone, Baton Rouge, Spencer & Whalen, Washington, D.C., amici curiae.
Borron, Owen, Borron & Delahaye, Baton Rouge, for intervenor-appellee.
H. Alva Brumfield, Baton Rouge, for plaintiff-appellee.
HAWTHORNE, Justice.
Mrs. Cecilia LeBlanc Day instituted this suit on her own behalf and as natural tutrix of her minor children, Judy Dianne Day and Randall Joseph Day, to recover damages for the death of Willie Day, her husband and the father of her children. Day was fatally injured as a result of a boiler explosion which occurred while his employer, Vince Plumbing & Heating Company, a subcontractor, was installing a hot water system in a new building of the tuberculosis hospital at Greenwell Springs, Louisiana. Several persons, firms, and *662 corporations, with their insurers, were named defendants. The district court gave judgment for plaintiff against Wilson & Coleman, the firm of architects on the building, and its insurer,[1] and held the other defendants relieved of any liability. The Court of Appeal likewise gave judgment for plaintiff against the architects and their insurer, increased the awards in favor of plaintiff and her children, and affirmed the judgment dismissing the suit against all other defendants.[2] See La.App., 117 So.2d 104. We granted certiorari on application of the architects and their insurer.[3]
The Louisiana State Building Authority entered into a contract with defendant Wilson & Coleman, a firm of architects, to prepare plans and specifications for the construction of the New Patients' Building at the Greenwell Springs Tuberculosis Hospital. Upon completion of the plans and specifications by the architects a contract was entered into with Charles Carter & Company, Inc., a general contractor, for construction of the building. The contractor in turn negotiated a subcontract with Vince Plumbing & Heating Company, in which the latter undertook to perform all mechanical work as per plans and specifications (which were made part of this subcontract), including heating, plumbing, etc., necessary to complete the central heating system and the domestic hot water system. The boiler which exploded was a part of the domestic hot water system. After installation the boiler was lighted by an employee of Vince to test its operation. The explosion occurred shortly afterwards, and Willie Day, plaintiff's husband, who was standing near by, was scalded to death.
In their contract with the building authority the architects' services were to consist, among other things, of "supervision of the work" as indicated by a schedule set forth in the contract.[4] According to this schedule they were to prepare "complete working drawings, and specifications for architectural, structural, plumbing, heating, electrical and other mechanical work". In this schedule they further bound themselves to exercise "adequate supervision of the execution of the work to reasonably insure strict conformity with the working drawings, specifications, and other contract documents", and this supervision was to include, among other things, "* * * (b) inspection of all samples, materials, and workmanship * * * (d) checking of all shop and setting drawings (e) frequent visits to the work site * * *". (Italics ours.)
Pursuant to the authority given them by this contract the architects employed a firm of consulting engineers, Chesson, Forrest & Holland, at a fee of 3 per cent of the cost of mechanical and electrical work, to be paid from the proceeds of the 6 per cent fee which the architects were to receive from the owner. Under their contract with the architects the consulting engineers, among other things, prepared for the architects plans and specifications for all mechanical and engineering equipment to be incorporated in the building. It was the duty of these engineers to consult *663 with and advise the architects about the proper mechanical and electrical equipment for the building. They were to examine all shop drawings submitted by the contractor or the subcontractor and report to the architects, and make a final inspection and report to the architects when the general contractor had completed the work. The architects admitted that they relied on the consulting engineers' technical ability for the installation of the mechanical and electrical equipment, of which the boiler that exploded was a part, because they themselves were without the specialized knowledge to determine whether the mechanical equipment was installed in a safe way.
The architects' specifications plainly stipulated that the hot water heater or boiler was to be provided with a thermostat, and that the contractor was to "equip hot water heaters with temperature and pressure relief valves".
The specifications further provided that in the installation of the domestic hot water system the contractor before proceeding with the work "shall make complete shop and working drawings of such apparatus or connections as directed by the Architects and/or hereinafter required. These drawings shall show construction details and dimensions of each piece of equipment so drawn". The provision quoted was found in that part of the specifications dealing with plumbing. In Section 1 of the general contract specifications under the heading "Shop Drawings" it was provided that four copies of shop drawings or data for all mechanical work should be submitted, and two corrected or approved copies returned to the contractor, and that no shop drawings should be submitted by any subcontractor directly to the architects or to the architects' consulting engineers. This section further specifically provided: "Shop drawings marked `Approved as Noted', are assumed to be approved for fabrication or placing orders." (Italics ours.)
As stated previously, the general contractor entered into a subcontract with Vince Plumbing & Heating Company. The plans and specifications were made a part of this subcontract and were referred to as "the contract documents". The subcontract recited that the subcontractor was thoroughly familiar with the contract documents and agreed to be bound by them.[5]
After obtaining the subcontract Sam Vince, sole owner of Vince Plumbing & Heating Company, furnished to the architects through the general contractor, as provided in the specifications, a brochure for their approval of certain equipment. The terms "brochure" and "shop drawing", as shown by this record, are interchangeable and mean the same thing. In other words, a brochure was considered by all as a shop drawing, as that term was used in the specifications. This brochure was submitted by the architects to the consulting engineers, who approved it with certain exceptions. This qualified approval, according to the evidence, was tantamount to rejection in toto. Vince then submitted a second brochure. This brochure also was referred to the architects' consulting engineers, and on the advice of the engineers was likewise disapproved by the architects. These two brochures were disapproved for causes which were in no way related to the subject of the boiler explosion. A third brochure was submitted to the architects, who, without submitting it to their consulting engineers, endorsed it "Approved as Noted" and returned it to Vince. All these brochures were prepared for Vince by Amstan Supply Division of American Radiator and Sanitary Corporation. The approved brochure did not specify or list a pressure relief valve for the hot water boiler which subsequently exploded.
After receiving the approved brochure or shop plan Vince ordered the material and equipment shown in it, and proceeded with the installation of the domestic hot *664 water system. In making the installation of the hot water heater, a part of this system, Vince failed to follow the plain provision of the specifications that the hot water heater or boiler should be equipped with a thermostat and with a temperature and pressure relief valve. He installed the hot water boiler without a pressure relief valve, and instead of putting the thermostat and the temperature relief valve on the boiler he installed these safety devices on a hot water storage tank. After the installation of the hot water system Vince, to check his own work, caused the boiler to be lighted for a preliminary testing, and the explosion ensued which resulted in the death of Vince's employee Day.
At this point it may be well to note that Vince made this preliminary test without informing either the architects or the consulting engineers that the hot water system was ready for inspection, and did not request any of these persons to make an inspection at any time before the explosion.
It is clear from this record, as shown by the testimony of the experts, that because of the method of installation the explosion of the boiler was inevitable. Among other things, it was not equipped with a pressure relief valve as called for by the specifications, and, further, if this boiler had been equipped with such a valve, the explosion could not have occurred. As said by the Court of Appeal, the experts "all stated that, assuming all component parts performed their respective functions, the explosion would nevertheless have eventually occurred because of the absence of a pressure relief valve on the system".
The Court of Appeal, 117 So.2d 104, found that Vince, the subcontractor, was guilty of gross and inexcusable negligence;[6] that the doctrine of res ipsa loquitur was applicable insofar as the architects were concerned; that the architects were negligent both in failing to inspect the domestic hot water system during the course of its installation and in approving the subcontractor's shop drawing which did not have a pressure relief valve for the hot water boiler; and that such negligence was the proximate cause of the explosion.
In denying an application for a rehearing the Court of Appeal in a per curiam stated that because of the gravity of the questions raised in the application for a rehearing as to the correctness of its holdings that the doctrine of res ipsa loquitur was applicable insofar as the architects were concerned, that the architects were negligent in failing to inspect the hot water system during its installation, and that this negligence was a proximate cause of the accident, it would be inclined to grant a rehearing upon these restricted issues. The court refused a rehearing, however, because it was convinced of the correctness of its holding that "the negligence of the architects in approving the plumbing subcontractor's shop drawings was responsible for the absence of a pressure relief valve upon the domestic hot water system, and that such negligence was thus a proximate cause of the explosion".
Let us first determine whether the doctrine of res ipsa loquitur is applicable in the instant case.
As this court has often said, the doctrine of res ipsa loquitur is a rule of evidence, the applicability of which is to be determined in each case at the conclusion of the trial. When the doctrine of res ipsa loquitur is applicable to a case, the accident which has caused plaintiff's damages makes out a prima facie case of negligence by the defendant, and the burden is then on the defendant to show absence of negligence on its part. Gerald v. Standard Oil Co. of Louisiana, 204 La. 690, 16 So.2d 233; Hake v. Air Reduction Sales Co., 210 La. 810, 28 So.2d 441; Northwestern Mutual Fire Association v. Allain, 226 La. 788, 77 So.2d 395, 49 A.L.R.2d 362, and authorities *665 there cited. This doctrine is a qualification of the general rule that negligence is not to be presumed but must always be affirmatively proved, and therefore should be sparingly applied, and only in exceptional cases where the demands of justice make that application essential. See Security Insurance Company v. Omaha Coca-Cola Bottling Co., 157 Neb. 923, 62 N.W.2d 127; Nopson v. City of Seattle, 33 Wash.2d 772, 207 P.2d 674; 65 C.J.S. Negligence § 220, p. 1031.
The following is found in 38 Am.Jur. 999, sec. 303, Negligence:
"The doctrine of res ipsa loquitur has no application where all the facts and circumstances appear in evidence. Nothing is then left to inference and the necessity for the doctrine does not exist. Being a rule of necessity, it must be invoked only where evidence is absent and not readily available. It is not to be invoked when the evidence is available, and certainly not when it is actually presented. Nor has it any application where the cause of the accident is known and is not in question."
On this point, see also Res Ipsa LoquiturAvailability, 33 A.L.R.2d 791, 793; Prosser, Handbook on the Law of Torts, p. 214 (1955).
In Southwestern Gas & Electric Co. v. Deshazo, 199 Ark. 1078, 138 S.W.2d 397, the Supreme Court of Arkansas refused to use the doctrine of res ipsa loquitur in deciding the case before it and said in explanation that it was committed to the theory that the doctrine cannot be availed of where there is direct evidence as to the precise cause of the accident and all the facts and circumstances attendant upon the occurrence clearly appear. In such a case, the court stated, nothing is left to inference and no presumption can be indulged.
In Dunaway v. Maroun, 178 So. 710, 712, the Louisiana Court of Appeal, Second Circuit, refused to apply the doctrine in a case involving injuries received in an automobile accident. The opinion quoted extensively from Blashfield's Cyclopedia of Automobile Law & Practice, v. 9, secs. 6043, 6048, 6046, dealing with res ipsa loquitur, including a statement that the doctrine "does not apply in any case where there is direct testimony as to the cause of the accident".
Although the plaintiff was justified in relying on the doctrine of res ipsa loquitur in her petition in this case because she was ignorant of the cause of the boiler explosion which killed her husband, under the above authorities the doctrine should not be used by this court in deciding the suit, nor should it have been relied on by the Court of Appeal or by the district court in finding for petitioner. As shown by the authorities, its applicability is to be determined at the conclusion of the trial. In the instant case all the facts and circumstances leading to the explosion of the boiler are in evidence, the cause of the explosion has been fully established by the evidence, and nothing is left to inference. Therefore, since the rule is not applicable here, we must determine whether plaintiff in the instant case has proven by a preponderance of the evidence that the architects were negligent and that their negligence had causal connection with, or was a proximate cause of, the boiler explosion which killed Day.
Let us now consider the holding of the Court of Appeal that the terms and conditions of the architects' contract with the State Building Authority imposed upon the architects the obligation of supervising the installation of the domestic hot water system, that the architects breached this obligation because neither they nor their agents, the engineers, were aware that this system was being installed and neither they nor the engineers inspected the system during installation or after completion, and that all *666 of this constituted negligence by the architects.
Before discussing this holding we should point out that we do not have here a case where the architects failed to provide in the specifications for a pressure relief valve on the boiler and for other safety devices; or a case where they inspected and approved the installation, or even where they had knowledge of the installation and stood by and permitted the boiler to be tested without having proper safety devices; or a case where they visited the site after the completion of the installation and, knowing that the boiler was to be tested, failed to observe that the boiler was not equipped with the safety devices stipulated in the specifications. Under such circumstances we should not hesitate to say that they breached a duty and that they reasonably should have foreseen that this breach would cause damage.
The narrow question here presented is whether the architects' contract with the owner imposed upon them the duty to be aware that the boiler was being installed by Vince, the plumbing subcontractor, and whether they were required by their contract to inspect the hot water system, of which the boiler was a part, during installation and before the boiler was tested by the subcontractor Vince.
In their contract with the owner the architects bound themselves to exercise "adequate supervision of the execution of the work to reasonably insure strict conformity with the working drawings, specifications and other contract documents", and this supervision was to include "frequent visits to the work site". If this provision of the contract required the architects to know that the boiler was being installed and required them to inspect the installation while it was in progress and before the system was tested, then the decision of the Court of Appeal may be correct. We therefore must determine the meaning of the above quoted provision of the contract.
As we view the matter, the primary object of this provision was to impose the duty or obligation on the architects to insure to the owner that before final acceptance of the work the building would be completed in accordance with the plans and specifications; and to insure this result the architects were to make "frequent visits to the work site" during the progress of the work. Under the contract they as architects had no duty to supervise the contractor's method of doing the work. In fact, as architects they had no power or control over the contractor's method of performing his contract, unless such power was provided for in the specifications. Their duty to the owner was to see that before final acceptance of the work the plans and specifications had been complied with, that proper materials had been used, and generally that the owner secured the building it had contracted for.
Thus we do not think that under the contract in the instant case the architects were charged with the duty or obligation to inspect the methods employed by the contractor or the subcontractor in fulfilling the contract or the subcontract. Consequently we do not agree with the Court of Appeal that the architects had a duty to the deceased Day, an employee of Vince, to inspect the hot water system during its installation, or that they were charged with the duty of knowing that the boiler was being installed.
We might add that the record discloses that as the work progressed over a period of some nine months before the explosion, the architects in performance of their duty to the owner made frequent visits to the work site in order to determine that the work in progress was being executed in conformity with the plans and specifications and other contract documents, all in accordance with what was considered by other architects who testified in the case *667 as good and accepted architectural practice.
We finally consider the question of whether the architects were negligent in approving Vince's shop drawing or brochure which did not specify the pressure relief valve for the boiler and, if this was negligence, whether such negligence was a proximate cause of the accident.
In their contract with the owner the architects were required to have "all engineering work under this architectural contract such as structural, * * * mechanical, and/or other engineering * * * performed by licensed professional engineers * * *". To carry out this provision the architects employed at their own expense a firm of consulting engineers, of which Don Chesson was a member. Among other duties the engineers were to advise and consult with the architects about the equipment that was to be installed in the domestic hot water system. The method by which this was done was as follows: The subcontractor Vince would submit a shop plan or brochure to the general contractor listing equipment to be used in the system. The contractor would pass the shop plan on to the architects, who in turn would refer it to their engineer, Chesson, for consideration and for his advice on whether they should approve or reject it. This procedure was in accordance with the specifications. The specifications further provided that before proceeding with the installation of the hot water system the contractor should have complete shop and working drawings made of such apparatus and connections as directed by the architects and/or hereafter required, and that these drawings were to show construction details and dimensions of each piece of equipment so drawn. Further according to the specifications, shop drawings "Approved as Noted" were assumed to be approved for fabrication or placing orders.
During the progress of his work Vince successively submitted two shop drawings which were rejected by the architects on the advice of Chesson, the engineer. These shop plans were disapproved for causes which were in no way related to the subject of the boiler explosion. Vince then submitted a third shop plan, and the architects without referring it to their engineer wrote "Approved as Noted" on it and caused it to be returned to Vince. These shop plans were prepared for Vince without any expense to him by Amstan Supply Division of the American Radiator and Sanitary Corporation. This third shop plan, approved by the architects under the above circumstances, did not list a pressure relief valve for the hot water boiler which subsequently exploded. In this connection Chesson testified that no equipment for the hot water system was approved by him before the explosion.
It is to be noted that according to the specifications a shop plan "Approved as Noted" was assumed to be approved for fabrication or placing orders. The architects contend that the brochure approved by them was submitted by Vince to obtain their approval only for the purchase of the items listed and designated therein; that it was not approved for fabrication or as a detailed plan for the installation of the boiler.
Vince testified that these shop plans were made for him by Amstan to be presented to the architects and engineers for their approval, which had to be secured before the plumbing supply house would accept an order for the items listed. A representative of the plumbing supply house which prepared them stated that such documents are usually prepared for a contractor who wants to order from the company certain equipment, and do not necessarily list all items called for in the specifications because the supply house only furnishes the contractor that part of the equipment which he needs.
The plans and specifications required many items to be incorporated in the domestic hot water system and listed them in detail, whereas the brochure prepared by *668 Amstan listed only a few of the items required by the specifications to be installed in the system. A comparison of the items of equipment listed in the brochure with those called for in the specifications shows beyond doubt that the brochure was not intended to include all of the equipment required for the installation of the boiler, a part of the domestic hot water system.
As we view the matter, the architects' approval of the brochure was only an approval for Vince to place the order with Amstan for the purchase of the items listed in it, and the brochure was not intended as a shop plan for fabrication or a plan showing construction details.
There is still another convincing reason why plaintiff cannot recover because of the architects' approval of the brochure. Let us assume a position most favorable to the plaintiff and concede that the brochure was in fact a shop plan submitted by Vince for installation of the boiler, purporting to show all construction details and all connections and safety devices to be installed thereon, but not listing or calling for a pressure relief valve, and that the architects were negligent in approving the shop plan for the installation of the boiler. Even if we should concede all this, however, it was established beyond any question by plaintiff's own witnesses that Vince, the subcontractor, did not use or rely on this brochure in his installation of the boiler. Accordingly its approval by the architects had no causal connection with, and was not a proximate cause of, the explosion. We therefore conclude that plaintiff's suit against the architects should be dismissed.[7]
Before concluding we should like to observe that there is one other phase of the case which has caused us concern and to which we have given careful thought and study. This is the hopeless conflict between the testimony of Vince, the plumbing subcontractor, and that of Chesson, a member of the firm of consulting engineers employed by the architects. Vince's employee Burkett, who installed the hot water system, testified that the installation was made in strict accordance with a sketch or plan given to him by Vince. Both Vince and Burkett testified that this sketch gave the design and method of installation in detail, showing various connections, safety devices, etc.; that this sketch did not provide for a pressure relief valve for the boiler, and called for the installation of certain other safety devices on a storage tank instead of on the boiler, all contrary to the specifications. Vince testified positively that this sketch was prepared by Chesson, the engineer, and given to him with instructions to make the installation in accordance with it, as he was bound to do under his contract. The testimony of Vince is emphatically denied by Chesson, who testified that at Vince's request he prepared only a sketch of how to connect the return line to the cold water inlet line, which had nothing to do with the installation of the various safety devices. The sketch which Vince used was never produced at the trial. Burkett testified that documents of this kind were usually retained, and that he had seen the sketch since the explosion, but stated later that it must have been in the boiler room at the time of the explosion and was lost. It is therefore impossible to tell from the evidence whether Vince or Chesson made the sketch.
Both the district court and the Court of Appeal evidently refused to accept Vince's testimony on this phase of the case, for both courts dismissed plaintiff's suit against the consulting engineers, who were defendants in the suit. After a careful consideration we cannot say that the Court of Appeal and the district court erred in refusing to accept *669 Vince's testimony, particularly since Vince himself admitted at the trial of this case that in a deposition given before the trial he had not told the entire truth. However, if we concluded that an error was made in rejecting his testimony, such a conclusion would raise other legal questions which would have to be answered before plaintiff's demand should be rejected.
For the reasons assigned the judgment of the Court of Appeal insofar as it awarded plaintiff damages against the architects and their insurer is reversed and set aside, and plaintiff's suit is dismissed at her costs.
McCALEB, Justice (concurring).
I am in accord with the findings of fact and law set forth in the majority opinion. However, I do not subscribe to the obiter dictum contained therein respecting the conclusions which would be reached by the Court under various assumed facts which do not appear herein. Therefore, I respectfully concur.

On Application for Rehearing
PER CURIAM.
On application for rehearing, the plaintiff strenuously urges that the holding in the instant case is in conflict with our decision in Marine Insurance Company v. Strecker, 234 La. 522, 100 So.2d 493, because of our failure to properly apply Article 2315 of the LSA-Civil Code. There is no conflict in these cases. The Court has given the basic codal article full and painstaking consideration. Both the breach of a legal duty to the deceased and proximate causation are prerequisites for liability under the article. We have been unable to find a breach of such a duty by the architects or any fault on their part which was the proximate cause of the tragic accident. Hence the architects are not liable.
The rehearing is refused.
NOTES
[1] Philip Arnold by stipulation was substituted for Lloyds of London, liability insurer for the architects.
[2] North River Insurance Company, compensation insurer of the subcontractor, intervened in the suit and was awarded judgment in the district court and in the Court of Appeal against plaintiff Mrs. Day, individually and as natural tutrix of the minors, for the amount of compensation paid and to be paid and for medical expenses and attorney's fees paid by it. The judgment in favor of the insurer was conditioned upon the judgment in favor of Mrs. Day becoming final.
[3] Although the Court of Appeal amended the district court's judgment by increasing the quantum in favor of plaintiff, relators make no complaint on this score, and quantum is therefore not an issue here.
[4] For contract between owner and architects, see Plaintiff Exhibit P-1.
[5] For subcontract, see Wilson & Coleman Exhibit No. 9.
[6] Vince, decedent's employer, is not a defendant in the suit.
[7] Under our decree in this case the judgment in favor of intervenor, North River Insurance Company, compensation insurer of the subcontractor, will be without force and effect as it was conditioned upon the judgment in favor of Mrs. Day individually and as natural tutrix becoming final.