**TOWER COMMUNICATIONS COMPANY**

v.

**ETCO ENGINEERS TESTING LABORATORY, INC.**

**Civ. A. No. 3132.**

United States District Court
E. D. Louisiana,
Baton Rouge Division.

Dec. 19, 1966.

Victor A. Sachse, Bert K. Robinson, Breazeale, Sachse & Wilson, Baton Rouge, La., for plaintiff.

Louis G. Baine, Jr., A. G. Seale, Seale, Hayes, Smith & Baine, Baton Rouge, La., for defendant.

WEST, District Judge:

Plaintiff, Tower Communications Company, brings this suit against Etco Engineers Testing Laboratory, Inc., seeking damages for alleged breach of contract. The United States of America, through the Bureau of Reclamation, as principal, contracted with General Dynamics Corporation, through its Stromberg-Carlson Division, as prime contractor, for, among other things, the designing, building, and erecting of certain microwave towers. These towers were to be erected at twenty-eight different sites along a line through the Rocky Mountain area, approximately 2,000 miles long, extending through five states. General Dynamics Corporation then entered into a subcontract with Micom, Inc., who was to actually design, construct, and install the towers. Thereafter, Micom employed Etco, defendant herein, to perform certain work in connection with subsurface exploration and soil testing at the various tower sites. After Etco had performed a substantial portion of its work, Micom encountered financial difficulties and ultimately became a bankrupt. Plaintiff, Tower Communications Company, purchased certain of Micom's assets from the trustee in bankruptcy and undertook to complete Micom's work under its contract with Stromberg-Carlson. After the work was completed, Tower refused to pay Etco for the work which it, Etco, had performed on this project, contending that Etco had failed to perform the services which it had contracted to perform, and then Tower filed this suit demanding $52,640.30 in damages which it allegedly sustained because of Etco's failure to perform. Etco contends that it performed all of the services contracted for; that it has never been paid the $4,595.60 due it for services rendered, and that it is now entitled to be paid for those services. Etco also counterclaimed against Tower for damages allegedly sustained as a result of this suit having been filed by Tower, but this counterclaim for damages was dismissed by the Court as being prematurely made. Thus the remaining issues before the Court relate to whether or not Etco is entitled to be paid by Tower for the services which it, Etco, rendered on this job, and whether or not Tower is entitled to recover damages from Etco for failure to properly perform services which it contracted to perform.

After seeing and hearing all of the evidence in this case, and after carefully considering the arguments and briefs of counsel, this Court concludes that the plaintiff has failed to prove by a preponderance of the evidence that Etco did not properly perform according to the terms of its contract, and that Etco has proved by a preponderance of the evidence that it is entitled to be paid by Tower for the services which it rendered on this job. In connection therewith the Court now makes the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

1. The United States of America, through the Bureau of Reclamation, entered into a contract with General Dynamics Corporation, through its Strom-

berg-Carlson Division, for, among other things, the construction of microwave towers for the project known as the Colorado River Storage Project. General Dynamics, through its Stromberg-Carlson Division, was to build towers at twenty-eight specified sites, extending over a line approximately 2,000 miles long, running through five states in the Rocky Mountain area. These towers were to be built in accordance with the United States Department of Interior, Bureau of Reclamation Specifications No. DC-5853.

2. General Dynamics then entered into a subcontract with Micom, Inc. for the actual design, construction, and installation of the towers and their foundadations.

3. In connection with the tower foundations, the Bureau of Reclamation Specifications No. DC-5853 provided:

"7. *Foundations and Anchors—Concrete or other Material*

"(a) Foundations and anchors for self-supporting and guyed towers shall be designed for dead and live loads and the soil conditions existing at each tower site. Adequate subsurface exploration to sound rock or to a minimum depth of 20-feet where sound rock is not encountered shall be made at each tower site in accordance with ASTM Tentative Method for Penetration Test and Split-barrel Sampling of Soils. D1586-58T. Penetration resistances and logs for each tower site shall be furnished to the Assistant Commissioner and Chief Engineer, Bureau of Reclamation, Building 53, Denver Federal Center, Denver 25, Colorado, Attention: Code D-260.

"(b) In bearing, foundations shall be designed for dead loads and the maximum live loads specified under 2. The maximum bearing pressure on rock shall not exceed 4,000 pounds per square foot. The allowable design bearing pressure on earth shall be based on the following:

| "Soil type | In-place condition | N Value* | | |
|---|---|---|---|---|
| | | 1,000 psf | 2,000 psf | 4,000 psf |
| Silt & clay | Wet or dry | 8 | 12 | 22 |
| Sand | Dry to moist | | | |
| Sand | Below water table | 10 | 20 | 35 |

" *These values shall be obtained by the ASTM Tentative Method for Penetration Test and Split-barrel Sampling of Soils, D1586-58T. The 'N' values are minimum for the loadings given on the assumption that the foundation conditions are uniform and there are no significant moisture changes after construction. If it is anticipated that the moisture will increase after construction, the soil shall be thoroughly wetted prior to performing the test. The maximum allowable soil pressure shall not exceed 4,000 pounds per square foot."

4. In December of 1963, Dr. Louis Capozzoli, Jr., who at times pertinent to this law suit was Vice President and Chief Engineer of Etco, was informed by Mr. A. N. Ohlfest, a sales representative of Micom, that Micom was in the process of preparing a bid on the tower work to be submitted to Stromberg-Carlson. Dr. Capozzoli was asked to submit a figure on furnishing certain soil data pertaining to the tower sites. He was told by Mr. Ohlfest that "All you have

to do is drive to the site then go down to rock, say twenty feet, and that is all." For this work, on twenty-eight tower sites, Dr. Capozzoli quoted a figure of "between $2,500 and $3,000." Micom actually used the figure of $2,800, or $100 per site in preparing its bid.

5. In March or April of 1964, Dr. Capozzoli visited the office of Micom in Dallas, Texas, at which time he discussed in detail with Mr. P. R. Braginton, a Micom engineer and Vice President of Operations, the work to be done in connection with the soil tests for the foundations of the towers. Dr. Capozzoli had previously done work of a similar nature for Micom in connection with the building and erection of nineteen microwave towers in Louisiana, and at that time he had been employed to investigate site conditions and to submit a detailed report and analysis, including drilling holes, coring rock, analyzing samples, and making detailed recommendations for tower and anchor foundations. The report submitted by Etco in that instance covered some 125 pages, and was a complete, detailed report and recommendation. He informed Mr. Braginton that if such information was required on this job, there would, of course, be charges in addition to the figure quoted in December. He advised Mr. Braginton that the $2,800 figure included only going to the site, taking a boring to twenty feet, reporting his findings, and nothing else. Mr. Braginton replied that this was all they wanted because "This would satisfy the Bureau of Reclamation." As a result of this conversation, Etco undertook to go to each tower site and to drill one hole at each tower site "to sound rock up to a minimum depth of twenty feet where sound rock is not encountered." However, because of the fact that the work would have to be done in two stages, requiring two trips from Louisiana to the site area, a final figure of $4,000 plus necessary expense for rental of equipment was agreed on. There is no dispute here of the fact that if Etco

is to recover, it would be entitled to the sum of $4,595.60 for services rendered.

6. In April of 1964, after Etco's crew reached Colorado and started taking borings, it became apparent that the simple boring, penetration tests and split-barrel sampling agreed upon would not necessarily indicate the exact nature of the resistance met by the auger. For example, it was impossible from this limited test to determine whether the resistance was caused by undisturbed rock or by boulder. Micom was advised of this by Dr. Capozzoli who again suggested that he be authorized to core the subsurface rock in order to determine its exact nature. Micom refused these services as being beyond what the Bureau of Reclamation required, and informed Dr. Capozzoli that they, Micom, would not pay him for coring rock.

7. A conference telephone conversation was held on April 14, 1964, between Mr. R. L. Wilson, representative of Stromberg-Carlson, Dr. Capozzoli, of Etco, and Mr. Braginton, of Micom, during which the difficulties encountered in determining the nature of the resistance was discussed. It was then agreed that the tests to be used by Etco would be those specified in the Bureau of Reclamation Specifications; that when refusal was met by the auger at a point below the depth of the foundation, but less than twenty feet, a single sample and log for that location would be sufficient; and that if refusal was encountered at a depth less than the excavation depth of the foundation, a second boring would be made and both samples and logs would be furnished the Bureau. This agreement was confirmed by letter of April 16, 1964, from Stromberg-Carlson to Micom, and by letter of April 22, 1964, from Micom to Stromberg-Carlson.

8. All twenty-eight tower sites were then tested by Etco in strict accordance with this understanding. One hole per tower site was bored where refusal was not met at a minimum depth of twenty feet, or where refusal was met at a point below the depth of the foundation but less than twenty feet, and where

refusal was met at a depth of less than the excavation depth of the foundation, two or more holes were bored. The final logs of the borings, showing bearing pressures, etc., were sent by Etco directly to the Bureau of Reclamation, with copies to Micom and Stromberg-Carlson, and the samples of the borings were delivered to Mr. Robert Reynolds, of Stromberg-Carlson, who in turn delivered them to the Bureau. This procedure was in accordance with the agreement between the parties and was not here complained of.

9. Sixteen of the twenty-eight sites were worked by Etco in April of 1964, and the remaining sites were worked in June of 1964. At eight of these sites, where refusal was met at a depth less than the excavation depth of the foundation, at least two holes were bored and the results sampled and logged.

10. In May, 1964, Micom, encountering financial difficulties, commenced negotiations with Tower Communications Company, plaintiff herein, for the purchase by Tower of certain of Micom's assets. Among those assets considered for purchase by Tower was a backlog of unfinished contracts, including the one covering the Bureau of Reclamation job. Negotiations with Micom continued until some time in July of 1964, when Micom went into bankruptcy. At that time, according to Mr. Scott Kennimer, Assistant to the President of Tower Communications Company, the Bureau of Reclamation job "became very hot" and they, Tower, "scrutinized" it "very closely." About August 10, 1964, Tower completed its appraisal of this job, and thereafter, by agreement between Tower, Stromberg-Carlson, and the Referee in Bankruptcy, the Bureau of Reclamation job was transferred from Micom to Tower Communications Company. The physical work on tower construction at the tower sites was started about the second week in August. Prior thereto, on April 30, 1964, long before Tower purchased this contract from Micom, Etco had billed Micom for $2,300, representing its fees due for the work performed on sixteen of the tower sites. This bill was unpaid and outstanding when Tower negotiated and consummated its agreement with Micom and the Referee in Bankruptcy to take over the Bureau of Reclamation job.

11. By the time Tower actually took over this job from Micom in August of 1964, all of the on-site work, and possibly all of the office and laboratory work undertaken by Etco pursuant to its agreement with Micom, had been completed, but the logs and sampling information on several of the sites had not yet been sent to Micom.

12. When Etco learned of the transfer of Micom's contract to Tower, it became uneasy about payment of its bill for services rendered and to be rendered under its agreement with Micom. No payment had been made to Etco for any of its work, by either Micom or Tower.

13. On July 10, 1964, Etco advised Tower by letter that it had completed all field work on the project and that "foundation recommendations" had been sent on twenty-one of the twenty-eight sites investigated. It also reminded Tower of the outstanding and unpaid bill of $2,300, and stated that no further work would be done and no further information furnished until authorization to proceed was received from Tower. Etco also advised Tower that if payment was not received, it would be forced to exercise its lien privileges on the various sites upon which it had worked. In response to this letter, Tower, on July 28, 1964, sent its purchase order to Etco covering "soil borings and services" performed after May 1, 1964, in the amount of $2,295.60. Thereafter Etco, having completed its work, billed Tower for this amount, in addition to the $2,300 unpaid bill previously assumed by Tower when it took over from Micom. Neither the $2,300 bill nor the $2,295.60 bill has ever been paid.

14. At no time during the entire construction of the twenty-eight towers did Micom, Tower, Stromberg-Carlson, or the Bureau of Reclamation complain to Etco of the information which Etco had

furnished pursuant to its agreement with Micom, and at no time was Etco requested or authorized to bore more than the one or two holes per tower site agreed upon.

15. After all work on the several towers was completed, and Etco still had not received payment of any part of its bill for services rendered, and after Etco made demand upon Tower for payment of its bill, Tower, for the first time, complained to Etco by letter dated October 12, 1964, that the soil information furnished by Etco had been faulty and that as a result thereof, it was necessary for them, Tower, to redesign some of the tower foundations to accommodate actual field conditions, and that pending further investigation, processing of Etco's invoice would be delayed.

16. On November 10, 1964, Tower sent a detailed letter to Dr. Capozzoli outlining what it believed to be discrepancies between Etco's reports of site conditions and the on-site conditions actually encountered.

17. On January 26, 1965, this present suit was filed by Tower against Etco, demanding the sum of $25,000 (later amended to demand the sum of $52,640.30), representing damages allegedly sustained by Tower as a result of what it believed to be faulty and inadequate information furnished by Etco concerning the soil conditions at the various tower sites.

18. While the Bureau of Reclamation's specifications may have and probably did contemplate more extensive subsurface exploration than was actually performed by Etco, nevertheless, Etco performed all of the services that it was employed by Micom and/or Tower to perform.

19. The testimony of Dr. Capozzoli is unrefuted to the effect that he did, in fact, advise Micom that more extensive exploration was advisable, such as coring rock at the point of refusal, etc. These extra services were specifically refused by Micom. Neither Mr. Ohlfest nor Mr. Braginton were produced at the trial as witnesses to refute Dr. Capozzoli's positive testimony that it was agreed among them that only one hole per tower site was to be bored by Etco where refusal was not met at twenty feet, and that two holes would be bored only where refusal was met at a depth less than the excavation depth. Indeed, Stromberg-Carlson's letter of April 16, 1964 to Micom, and Braginton's letter of April 22, 1964 to Stromberg-Carlson fully support and corroborate Dr. Capozzoli's testimony.

20. Etco had performed soil exploration services for Micom on a previous occasion in connection with the construction of other microwave towers, and it had, on that occasion, been employed by Micom to perform much more elaborate services, including coring rock encountered by the auger, and submitting detailed foundation recommendations. The evidence stands unrefuted that Dr. Capozzoli did, in fact, suggest to Micom that the same extensive services be performed in this case, but that his suggestion was rejected by Micom and he was thus employed only to perform the limited services outlined above.

21. Even though Etco's letter to Tower dated July 10, 1964, refers to "foundation recommendations," nevertheless, as a matter of fact, all that Etco was to furnish under its contract with Micom was the logs of the borings, soil samples, and the penetration resistances found at each boring location. The borings were to be made and the samples obtained in accordance with the American Society of Testing Materials Tentative Method for Penetration Tests and Split-Barrel Sampling of Soils, and Mr. Reynolds, a representative of Stromberg-Carlson, and by designation of Micom, was to be present at each site to physically point out the location where the hole or holes at each tower site were to be bored. All of these services were rendered by Etco precisely as required by its agreement with Micom, and Mr. Reynolds did, in fact, point out to Etco's operators the exact location where each specific hole was to be bored.

22. By the time Tower took over the contract from Micom, Etco had furnished its logs and reports on at least sixteen of the sites. These reports were available to Tower, who, in anticipation of taking over the job, were, according to Mr. Kennimer, "scrutinizing it very closely." Thus, Micom, Tower, Stromberg-Carlson, and the Bureau of Reclamation all knew that even though some of the towers would require not only foundations for the tower itself, but also foundations for guy anchors at as many as nine different locations around the tower site, Etco was, as was clearly apparent from the logs and reports furnished, boring only one or two holes at each tower site. This was in accordance with Etco's contract with Micom and was apparently satisfactory to Tower, Stromberg-Carlson, and the Bureau of Reclamation, because no complaint was ever made by any of them to Etco, and Etco was authorized by Tower's purchase order of July 28, 1964, to proceed with the remainder of the work. With all of this knowledge in the possession of Tower, Stromberg-Carlson, and the Bureau of Reclamation, no request was ever made of Etco to sample the soil at the precise spot where the tower foundation was to be placed and at each of the locations where guy anchors were to be installed. Instead, all parties were content to have a sample taken only at the precise spot or spots pointed out to Etco by Mr. Reynolds.

23. Dr. Capozzoli advised Micom that additional work would be advisable. Micom rejected the suggestion. Tower, Stromberg-Carlson, and the Bureau of Reclamation all had in their employ engineers or technical personnel who were or should have been well aware of the fact that soil samples were not being taken at the proposed site of each guy anchor, as well as at the proposed site of each tower foundation. While it might well be that the Bureau of Reclamation intended by its specifications that such should be done, and while it might well be that the Bureau of Reclamation could have compelled Stromberg-Carlson to abide by what it contended its specifications called for, the fact remains that Etco did not contract with Micom to perform all work that might be required by the specifications as now interpreted by Tower. Etco only contracted to perform the limited services hereinbefore outlined.

24. Even though there was substantial evidence to support the claim that in some instances the soil conditions actually found to exist at the precise places where the tower foundations and guy anchors were ultimately located were not exactly as was indicated on Etco's reports, nevertheless, there was no evidence to show that the soil conditions at the precise locations selected by Mr. Reynolds and pointed out by him to Etco, where the samples were actually taken by Etco in accordance with its agreement with Micom, were not exactly as reported by Etco on the logs furnished Micom and Tower.

25. It is not uncommon for subsoil conditions at any given site, in mountain areas particularly, to vary greatly within a distance of a few yards or even feet. The engineers and technical people of Tower, Micom, Stromberg-Carlson, and the Bureau of Reclamation were well aware of this fact. Thus the fact that the on-site inspection found conditions of the subsoil at various anchor sites and at the ultimate tower foundation site to differ from that found by Etco to exist at the actual site of the boring does not in any way prove that the limited information furnished by Etco pursuant to its contract with Micom was faulty or incorrect.

26. While the Bureau of Reclamation Specifications provided that "If it is anticipated that the moisture will increase after construction, the soil shall be thoroughly wetted prior to performing the test," and while the evidence shows that the soil was not wetted before the tests were performed by Etco, nevertheless, the Court concludes that such a variation from the specifications is not material to the outcome of this case. The alleged deviations between the soil conditions

reported on the logs furnished by Etco and the conditions found upon on-site inspection were in no way caused by the failure to wet the soil before testing. The deviations complained of were caused instead by the failure of Micom and Tower to contract for or to otherwise seek to obtain "adequate subsoil exploration" at all locations where such exploration was necessary for proper erection of the towers.

### CONCLUSIONS OF LAW

1. This Court has jurisdiction over this matter and venue is properly laid in the Baton Rouge Division of the Eastern District of Louisiana. 28 U.S.C.A. § 1332.

2. A contract, unless contrary to law or public morals, is the law between the parties thereto. LSA–C.C. 1901; Cagle Supply of Lafayette, Inc. v. Hinson, La.App., 155 So.2d 773, writ den. 245 La. 83, 157 So.2d 230 (1963). The parties may make their own contracts, and however unusual they may be or what drastic or unreasonable features there may be therein, they form the law between them and should be enforced so long as they do not contravene good morals or public policy. Arkansas Fuel Oil Corp. v. Maggio, et al., La.App., 141 So.2d 516 (4th Cir. 1962).

3. The contract entered into between Etco and Micom was for the performance by Etco of certain specified services for a stated price to be paid by Micom. This contract was in no way contrary to law or public morals. Etco was legally obligated to perform those services in accordance with the contract, and Etco did, as a matter of law and fact, perform all of the services contracted for. When those services were performed in accordance with the contract, Micom and/or its successor under the contract, Tower, was legally obligated to pay Etco's bill.

4. While under the law of Louisiana when one holds himself out as an expert in a particular field of endeavor, another employing the services of such an expert has a right to rely on the skill, art, and science that such an expert holds himself out as possessing, Mixon v. Brechtel, 174 So. 283 (La.App.Orl.App.1937); Bush v. Bookter, La.App., 47 So.2d 77 (1st Cir. 1950), and while one holding himself out as an expert in any art, trade or profession has an obligation to warn of any incidental danger of which he has cognizance due to the particular knowledge of his specialty, Smith v. Ponder, La. App., 169 So.2d 683 (1st Cir. 1964), nevertheless, even an expert is not held to a duty not imposed upon him by the terms of his contract. Day v. National United States Radiator Corp., 241 La. 288, 128 So.2d 660 (1961). As stated by the Louisiana Supreme Court in *Day* at page 666 of 128 So.2d:

> "The narrow question here presented is whether the architects' contract with the owner imposed upon them the duty to be aware that the boiler was being installed by Vince, the plumbing subcontractor, and whether they were *required by their contract* to inspect the hot water system, of which the boiler was a part, during installation and before the boiler was tested by the subcontractor Vince." (Emphasis added.)

After reviewing the contract in the *Day* case, the Court then said:

> "Thus we do not think that *under the contract* in the instant case the architects were charged with the duty or obligation to inspect the methods employed by the contractor or the subcontractor in fulfilling the contract or the subcontract." (Emphasis added.)

5. While Stromberg-Carlson and Micom may have been obligated by their contracts as prime contractor and subcontractor respectively to comply with the Bureau of Reclamation Specifications requiring that "adequate subsurface exploration" be made, Etco was not so bound by its contract with Micom. Etco did not contract to make "adequate subsurface exploration." It only contracted to bore one hole per tower site, at a location to be pinpointed by a representative of Stromberg-Carlson, when refusal was met at a point below the depth of the

foundation but less than twenty feet, and to bore two holes at locations to be selected by the representative of Stromberg-Carlson where refusal was encountered at a depth of less than the excavation depth of the foundation, said borings to be made in accordance with the ASTM Tentative Method for Penetration Tests and Split-Barrel Sampling of Soils, and to furnish penetration resistances and logs for each boring thus made. The undisputed testimony of Dr. Capozzoli establishes the fact that he personally advised Micom that in his opinion more extensive exploration would be advisable, but this suggestion was rejected. The evidence clearly shows that Etco did all that it was required by its contract with Micom to do, and the plaintiff having failed to prove by a preponderance of the evidence that the information furnished by Etco pursuant to its contract was in fact erroneous, Etco, as a matter of law, has performed all of the obligations imposed upon it by the terms of its contract with Micom.

6. This suit of necessity must be based upon the claim that Etco violated the terms of its contract with Micom, and that since Tower, by arrangement with the Referee in Bankruptcy, was the successor to Micom insofar as that contract is concerned, Tower now has the right to sue for damages for Etco's alleged breach of that contract. This is necessarily so because the evidence clearly refutes any suggestion that a new contract was ever entered into between Etco and Tower. Thus, as a matter of law, Tower is now entitled only to such rights as Micom previously had under that contract. And by the same token, Tower is burdened only with whatever obligations Micom previously had by virtue of that contract. Absent a new contract between Tower and Etco, Tower was without authority to unilaterally change or enlarge the original contract. P. P. Williams & Co., et al. v. Roach, 12 La. App. 305, 125 So. 465 (2nd Cir. 1929); Young v. Cistac, 157 La. 771, 103 So. 100 (1925). Thus, no new contract having been entered into between Tower and Etco, and Tower, both by its conduct and by its purchase order of July 28, 1964 having, in effect, confirmed the prior contract between Etco and Micom, and the Court having found both as a matter of fact and as a matter of law that Etco did not breach the terms of its contract but that instead Etco did perform all of the duties which it undertook by the contract to perform, Tower is now, as a matter of law, indebted unto Etco for the contract price of the services rendered which, according to the unrefuted testimony amounts to the sum of $4,595.60, together with interest from date of judgment until paid and for costs of this suit. Judgment will be rendered accordingly.