LOBRANO, Judge.
This appeal arises from a judgment rendered in favor of Edward Walters (Walters) and against Bernard and Thomas Engineering, Inc. (B & T), their insurer, United States Fidelity and Guarantee Insurance Company (USF & G) and the Mississippi River Bridge Authority (MRBA) for personal injuries received by Walters when he fell while employed as a steel worker at the Jackson Avenue Ferry Construction site.
As a result of the accident, Walters filed suit against the MRBA as the project owner and B & T as the project engineer. The MRBA filed third party claims against B & T, Gulf Marine Design, Inc. (as a joint venturer with B & T) and Landis Construction Company (Landis), the general contractor. B & T also filed a third party claim against Landis.[1] The worker’s compensation carrier, Traveler’s Insurance Company intervened as the compensation insurer of Simmons Steel Erection Company, Inc., Walter’s employer at the time of the accident.
FACTS:
Pursuant to an agreement between the MRBA and the United States Department of Transportation, Urban Mass Transportation Administration (UMTA), UMTA granted funds to the MRBA to enable it to undertake a capital improvement project to facilitate transportation across the Mississippi river. The funds were earmarked for, among other things, construction of new river ferry terminals, one of which was the *1308 Jackson Avenue ferry landing and terminal building.
Pursuant to this agreement, the MRBA then contracted with B & T to prepare the plans, specifications and contract documents for the construction of the terminal. The construction contract prepared by B & T was then presented by the MRBA to various contractors for bids. Landis Construction Company was the successful bidder. After signing the construction contract Landis, the general contractor, subcontracted with Simmons Steel Erection Company to erect the iron framework for the project. Walters was a steel worker employed by Simmons.
On April 16, 1979, Walters was sent to the project site at approximately 10:00 a.m. He was ordered to the third level of the structure where he was to join his co-workers in “bolting up” the steel frame which was approximately three-quarters complete. Nine workers were on the site, four of whom were steel workers employed by Simmons. Walters used a ladder to climb from the ground to the first level. Walters first attempted to reach the third level by climbing up a circular column. When this failed, he attempted to climb by means of a plumb cable. The cable, which had already been loosened, gave way. Walters fell some thirty feet to the concrete slab below and sustained serious injuries.
Because a public body was a defendant, the matter was tried by both judge and jury. The verdict of the jury and the trial court judgment are consistent. Judgment was rendered in favor of Walters finding that the MRBA and B & T contracted to enforce Occupational Safety and Health Administration (OSHA) regulations, (which required ladders to be furnished) and that their breach of this contractual duty was the proximate cause of Walter’s injuries. In addition, the Court granted judgment in favor of the MRBA on its third party claim against B & T and Landis. The Court also granted B & T contribution on its third party demand against Landis. The third party claims against Gulf Marine Design were dismissed. Compensation in the amount of $120,000.00 was awarded to Travelers as a result of its intervention.
The MRBA, B & T and Landis appeal the judgment of the trial court asserting the following specifications of error jointly and individually.
THE MRBA, B & T AND LANDIS EACH ASSERT:
1) The trial court erred by finding that the UMTA contract required the MRBA and B & T to enforce OSHA regulations and that there was a breach of that obligation.
2) The trial court erred in finding that a stipulation pour autrui exists in the contract between the MRBA and the UMTA in favor of Walters.
3) The trial court erred by finding that the MRBA and B & T were liable in tort.
4) The trial court erred in failing to find Walters guilty of contributory negligence.
B & T AND THE MRBA EACH ASSERT:
5) The trial court erred by allowing the introduction of OSHA regulations into evidence.
6) The trial court erred by charging the jury that the contract between the MRBA and the UMTA created a duty requiring the MRBA to enforce OSHA regulations.
LANDIS AND THE MRBA EACH ASSERT:
7) The trial court erred by not finding that the exclusive remedy against the MRBA was in Worker’s Compensation and that the MRBA was immune from tort liability pursuant to La.R.S. 23:1032.
8) The trial court erred in awarding interest from the date of judicial demand.
B & T INDIVIDUALLY ASSERTS:
9) The trial court erred in granting the MRBA’s third party claim against B & T.
10) The trial court erred in denying B & T's third party claim against the MRBA.
11) The trial court erred in denying B & T’s third party claim against Aetna Insurance Company, its insurer who denies coverage.
*1309 THE MRBA INDIVIDUALLY ASSERTS:
12) The trial court erred by casting Southern American Insurance Company in judgment.[2]
13) The trial court erred by dismissing the third party demand of the MRBA against Gulf Marine Design.
LANDIS INDIVIDUALLY ASSERTS:
14) The trial court erred in finding the MRBA entitled to indemnity from Lan-dis.
15) The trial court erred in finding the damages payable by the MRBA not covered by Southern American Insurance Company.
ISSUE
Resolution of the following issues is determinative of the result we reach in this case.
1) Did Congress intend that UMTA assume the enforcement responsibilities of OSHA and other labor standards, and if so, was that obligation transferred by contract to the MRBA?
2) Did B & T have a contractual obligation to enforce OSHA regulations irrespective of any such duty by MRBA?
As previously noted, the trial judge decided MRBA’s liability, while the jury determined the liability of B & T and Landis. The trial judge in his reasons for judgment, stated:
“A condition of the grant contract between MRBA and UMTA was that the receipt of the funds, i.e. the MRBA, ensure compliance by its contractor and subcontractors with safety and healthy standards promulgated by the Secretary (OSHA regulations and/or other health and safety regulations.)”
The first interrogatory to the jury, answered in the affirmative, provided:
“Do you find that MRBA was under a duty arising out of their contract with UMTA to assure compliance with OSHA regulations to guard against the risk that this type of plaintiff would be injured in the performance of work under the contract?”
Further, in his charge to the jury, the trial judge stated:
“It is not assumption of the risk or contributory negligence merely for a person to engage in a hazardous occupation. Now, in addition to this general standard of conduct, there is a statute applicable to defendant’s conduct. The Urban Mass Transportation Act of 1964 makes the contract work hours and safety standards act applicable to all grant contracts such as that which was entered into between the Mississippi River Bridge Authority and the Urban Mass Transit Administration, UMTA. The contract work hours and safety standards act cited above states as follows:” [here the court recited the provision of 40 U.S.C. § 333(a)]. (emphasis added)
Thus, it is abundantly clear that the basis of plaintiffs recovery is the premise that UMTA had an obligation to enforce OSHA standards, that the MRBA had assumed those enforcement obligations, and that plaintiffs injury was caused because the MRBA breached those obligations.
Plaintiff argues in two parts. First he asserts that the UMTA grant is subject to such terms and conditions as the Secretary of Transportation may prescribe. He argues that Section 13(b) of the United Mass Transportation Act of 1964 makes section 107 of the Contract Work Hours and Safety Standards Act (CWHSSA) applicable to all grants by the Department of Transportation.
Second, he urges that the grant contract between UMTA and the MRBA, executed May 3, 1974, specifically provided for assumption by the MRBA of the UMTA’s obligations. Plaintiff cites Part II, Section 102, Part, II, Section 109(b), and provisions in the External Operating Manual as being conclusive of the assumption by MRBA of *1310 the UMTA’s obligation to enforce OSHA and Section 107 of the CWHSSA.[3]
Defendants, MRBA and B & T, and third party defendant, Landis all assert that the provision of the grant contract relied on by plaintiff make no mention of OSHA, and that since OSHA was passed in 1970, six years after the UMTA (1964) there could be no legislative intent to make OSHA obligations part of that grant contract. MRBA and Landis argue that OSHA regulations cannot apply to state agencies, citing 29 U.S.C. § 652(2). B & T also argues that the provisions of the grant contract relied on by plaintiff refer to enforcement of Title VII of the Civil Rights Act of 1964, not OSHA. In support thereof they cite Executive Order 12086 reprinted at 42 U.S. C. § 2000e.
In summary, plaintiff’s position is that all Department of Labor regulations, including CWHSSA and OSHA, are applicable to grant contracts by the Department of Transportation, and thus are transferred to the MRBA by contract. Our discussion begins with the applicable provisions of UMTA.
A. Section 1609 of the Urban Mass Transportation Act
The Urban Mass Transportation act was passed in 1964. The purpose of the act was to assist in the development of improved mass transportation facilities, and to provide assistance to State and local governments in the financing of those systems. 49 U.S.C. § 1601. Included in that act, and codified at 49 U.S.C. § 1609, is a section entitled “Labor Standards.” That section provides:
“(a) Action of Secretary. The Secretary shall take such action as may be necessary to insure that all laborers and mechanics employed by contractors or subcontractors in the performance of construction work financed with the assistance of loans or grants under this Act [49 USCA Sec. 1601 et seq.] shall be paid wages at rates not less than those prevailing on similar construction in the locality as determined by the Secretary of Labor in accordance with the Davis-Bacon Act, as amended [40 USCA Sec. 276a et seq.] The Secretary shall not approve any such loan or grant without first obtaining adequate assurance that required labor standards will be maintained upon the construction work.
(b) Authority of Secretary of Labor. The Secretary of Labor shall have, with respect to the labor standards specified in subsection (a), the authority and functions set forth in Reorganization Plan Numbered 14 of 1950 (15 F.R., 3176; 64 Stat. 1267; 5 U.S.C. 133z-15), and section 2 of the Act of June 13, 1934, as amended (48 Stat. 948; 40 U.S.C. 276c) [40 USCA Sec. 276c].
(c) Interests of employees; protective arrangements; terms and conditions. It shall be a condition of any assistance under section 3 of this Act [49 USCA Sec. 1602] that fair and equitable arrangements are made, as determined by the Secretary of Labor, to protect the interests of employees affected by such assistance. Such protective arrangements shall include, without being limited to, such provisions as may be necessary for (1) the preservation of rights, privileges, and benefits (including continuation of pension rights and benefits) under existing collective bargaining agreements or otherwise; (2) the continuation of collective bargaining rights; (3) the protection of individual employees against a worsening of their positions with respect to their employment; (4) assurances of employment to employees of acquired mass transportation systems and priority of reemployment of employees terminated or laid off; and (5) paid training or retraining programs. Such arrangements shall include provisions protecting individual employees against a worsening of their positions with respect to their employment which shall in no *1311 event provide benefits less than those established pursuant to section 5(2)(f) of the Act of February 4, 1887 (24 Stat. 379), as amended. The contract for the granting of any such assistance shall specify the terms and conditions of the protective arrangements.”
As previously noted, plaintiff argues this section imposes the obligation on UMTA to enforce the Department of Labor’s OSHA and CWHSSA regulations. We disagree.
Subsection (b) of 1609 provides the Secretary of Labor the authority and functions of Reorganization Plan 14 of 1950 (5 U.S.C. § 903). That plan provides that certain Federal agencies, including the Department of Transportation, shall observe the appropriate standards prescribed by the Department of Labor. However, subsection (b) of 1609 limits the Secretary of Labor’s authority to those "... labor standards specified in subsection (a)....” Those standards in subsection (a) deal only with wage rates. Clearly that section says: “... all laborers and mechanics ... shall be paid wages at rates not less than those prevailing on similar construction in the locality as determined by the Secretary of Labor in accordance with the Davis-Bacon Act_”
Although it can be argued that the second sentence which requires disapproval of a grant "... without first obtaining assurances that required labor standards will be maintained ...” refers to OSHA and CWHSSA, the legislative purpose of § 1609(b) makes it clear those labor standards were neither considered nor intended.
House Report 204 of the Committee on Banking and Currency in its section by section summary of the bill, explains Section 10 (49 U.S.C. § 1609) as follows:
“Subsection (a) of this section provides that prevailing wages as determined in accordance with provisions of the Davis-Bacon Act are to be applicable to construction work financed with loans or grants under the provisions of the bill, and requires that the Administrator, before approving any such loan or grant, obtain adequate assurance that all required labor standards will be maintained (including the time-and-a-half requirements of the Work Hours Act of 1962).” H.R. 204, 88th Cong., reprinted at 1964 U.S.Code, Cong, and Ad.News 2569, 2588.
A complete reading of the House report supports the conclusion that Section 10 (1609) was in response to congressional concern with possible adverse effects on the “(1) preservation of rights, privileges and benefits (including continuation of pension rights and benefits) under existing collective bargaining agreements; (2) the encouragement of the continuation of collective bargaining rights; (3) the protection of individual employees against a worsening of their positions with respect to their employment; (4) priority of employment or reemployment of employees terminated or laid off; and (5) paid training or retraining programs.” Id. at 3584.
Thus, we find nothing in the legislative history of 49 U.S.C. § 1609 to support plaintiff’s argument that the intent of that section was to transfer to UMTA the Department of Labor’s obligation to enforce OSHA and/or CWHSSA regulations. We conclude subsection (b) of 1609 gives the Secretary of Labor authority “... only with respect to the labor standards specified in subsection (a) ... ” which does not include OSHA or CWHSSA regulations.
To further support this conclusion, we take particular note of the fact that the Urban Mass Transportation Act was passed in 1964, whereas section 107 of CWHSSA was passed in 1969, and OSHA was passed in 1970. There appears no amending legislation in section 13 of UMTA to include those two Labor Department responsibilities.
Plaintiff also argues that the language of Section 107 of the CWHSSA (40 U.S.C. § 333) suggests congressional intent to transfer the Labor Department’s enforcement responsibilities to the UMTA, and its grant recipient, the MRBA. We disagree. Section 333(a) provides in part:
“It shall be a condition of each contract which is entered into under legislature *1312 subject to Reorganization Plan Numbered 14 of 1950 (citation omitted) and is for construction, alteration and/or repair, including painting and decorating, that no contractor or subcontractor contracting for any part of the contract work shall require any laborer or mechanic employed in the performance of the contract to work in surroundings or under working conditions which are unsanitary, hazardous, or dangerous to his health or safety....” (emphasis added)
We cannot agree that this provision imposes an obligation on UMTA or the MRBA to enforce OSHA regulations.
As previously noted in fn. 3, supra, the regulations promulgated under 40 U.S.C. § 333 were subsequently adopted as part of OSHA regulations. When Section 333 was adopted in 1969, congressional concern was to “... promote health and safety in the building trades and construction industry in all Federal and federally financed or federally assisted construction projects ... .” Senate Report 91-320, 91st Cong, reprinted at 1969 U.S. Code, Cong, and Ad.News 1071. Since the construction industry was the only industry of the three major government contractors[4] not subject to protective legislation, Section 333 was proposed and adopted to authorize “... the Secretary of Labor to set standards which contractors and subcontractors would be required to meet on Federal, federally financed, or federally assisted construction.” Id. at 1072 (emphasis added)
It is clear that the first sentence of Section 333(a) fulfills the legislative intent to require contractors and subcontractors to comply with safety regulations. The word “contract” in the first sentence refers to a contract with a general or subcontractor, not a public-body grantee of federal funds. Our interpretation of that first sentence is “[i]t shall be a condition of each contract which is entered ... and is for construction, alteration, and/or repair ... .” The use of the conjunctive “and” describes the contract, i.e. one entered pursuant to legislation subject to Plan 14, and is for construction purposes.
This interpretation is consistent with the Labor and Public Welfare Committee’s summary of subsection (a), which provides in part:
“Section 107(a) [See 333 A of title 42] requires that it shall be a condition of each contract and subcontract which is entered into under legislation subject to Reorganization Plan No. 14 of 1950 (64 Stat. 1267), that the contractor or subcontractor contracting for any part of the work shall assure that any laborer or mechanic or other employee shall not be required in the performance of a contract to work in any place or under any working conditions, which are unsanitary, hazardous, or dangerous to his health and safety.”
Senate Report 91-320, supra at 1073. (emphasis added).
The responsibility of enforcing the provisions of subsection (a) is clearly that of the Secretary of Labor. 40 U.S.C. § 333(b); See also, Senate Report 91-320, supra at 1073. We find nothing in the act to suggest a transfer of that enforcement responsibility to UMTA or its grantee, the MRBA. We conclude Section 333 is intended to require that the contractor and subcontractor actually performing the work meet the Department of Labor safety standards.
We also note that our conclusion with respect to Section 333(a) is consistent with the subsequent OSHA legislation adopted in 1970. In particular, 29 U.S.C. § 652(5), which provides that OSHA shall not apply to a state agency. That is, a state agency is not considered an “employer” for OSHA purposes. Thus, it would be illogical to conclude that the MRBA had assumed the enforcement duties of the Department of Labor with respect to Landis and Simmons, when, by law, it does not have those responsibilities with respect to its own employees. In addition to the reasons cited above, to adopt plaintiffs Section 333(a) *1313 argument would also result in a circumvention of 29 U.S.C. § 652(5).
We therefore find that the trial court was in error when he charged the jury that “[t]he Urban Mass Transportation Act makes the contract work hours and safety standards act applicable to all grant contracts ....”
B. Contract Grant Between UMTA and MRBA
Plaintiff also argues that the wording of the grant contract between UMTA and MRBA clearly imposes OSHA enforcement responsibility on the MRBA. For the following reasons, we disagree with that argument.
As previously noted, plaintiff relies on three provisions of the contract to support his argument. We discuss each separately,
(a) Part II, Section 109(b)
This section appears under the general heading entitled “Restrictions, Prohibitions, Control and Labor Provisions.” The particular subsection -(b) is entitled “Construction Contracts — Nondiscrimination.” Subsection 7 of (b), relied on by plaintiff, provides in part:
“The Public Body agrees that it will assist and cooperate actively with the administering agency and the Secretary of Labor in obtaining the compliance of contractors and subcontractors with the equal opportunity clause and the rules, regulations, and relevant orders of the Secretary of Labor, that it will furnish the administering agency and the Secretary of Labor such information as they may require for the supervision of such compliance, and that it will otherwise assist the administering agency in the discharge of the agency’s primary responsibility for securing compliance.”
We agree with the argument of B & T that this provision deals exclusively with compliance with the Civil Rights Act of 1964 and equal employment opportunity. This provision appears in the contract under the section dealing with equal employment opportunity and nondiscrimination. There is no mention of OSHA or CWHSSA in that section.
We disagree with plaintiffs argument that the “and” between “equal opportunity clause” and “the rules, regulations, and relevant orders of the Secretary of Labor” indicates an intent to impose on the public body an obligation with respect to all labor rules and regulations. The Secretary of Labor, pursuant to executive Order 12086, is given the primary responsibility of enforcing non-discrimination in employment. 42 U.S. C. § 2000e. Thus, the “and” makes not only the “equal opportunity clause” applicable, but also the non-discrimination rules and regulations promulgated by the Department of Labor, the primary enforcement agency. This interpretation is consistent with the intent of 109(b) of the grant contract.
b) Section 5 of the Grant Contract
Section 5, also relied on by plaintiff, provides in part:
“Labor Protection — The Public Body agrees to undertake, carry out, and complete the Project under the terms and conditions determined by the Secretary of Labor to be fair and equitable to protect the interests of employees affected by the Project and meeting the requirements of Section 13(c) of the Act.”
Section 13(c) of the act means section 13(c) of the Urban Mass Transportation Act, codified at 49 U.S.C. § 1609(c). We have previously quoted the entirety of that act. Subsection (c) clearly deals with collective bargaining agreements and the benefits to transit employees thereunder. There is absolutely nothing contained in subsection (c) which is suggestive of OSHA or CWHSSA regulations. Therefore, we find no merit to the contention that Section 5 of the grant contract imposes responsibility on the MRBA to enforce those regulations. This provision of the grant contract is clearly a requirement which fulfills the Congressional concern (as previously discussed) when 49 U.S.C. § 1609 was adopted.
*1314 C. External Operating Manual
Plaintiff quotes in his brief the following language from the External Operating Manual as supportive of his argument:
“Labor Provisions — When required by the Federal grant program legislation . where applicable all contracts shall include a provision for compliance with sections 103 and 107 of the Contract Work Hours and Safety Standards Act (40 USC 327-330) ...”
With all due respect, plaintiff has omitted language of that provision which we deem pertinent. We quote the entirety of the pertinent paragraph appearing at page III C-14 and 15 of the External Operating Manual which provides:
“Where applicable, all contracts awarded by grantees and subgrantees in excess of $2,000 for construction contracts and in excess of $2,500 for contracts which involve the employment of mechanics or laborers shall include a provision for compliance with sections 103 and 107 of the Contract Work Hours and Safety Standards Act (40 USC 327-330) ...”
Clearly, when the omitted language is considered, the intent of the above quoted provision is to require all construction contracts awarded by the grant recipient (MRBA) to include a provision for compliance. Contrary to plaintiffs argument, the “contract” referred to in this provision is not the grant contract, awarding funds to the MRBA, but the construction contracts awarded by the grantee.
The MRBA fulfilled this obligation by requiring a compliance provision in its contract with Landis and Simmons Steel. Randy Paisant, the MRBA representative, testified as follows:
“Q. What did MRBA do then to make sure that Landis complied with OSHA?
A. Landis complied with OSHA?
Q. Yes.
A. We placed in the contract a clause which directed the contractor to comply with the OSHA regulations.”
In our opinion, the only obligation imposed on the MRBA by the above quoted provisions of the External Manual was to assure that all contracts awarded by it to contractors include a provision for compliance.
We therefore conclude that there is no legislative intent to transfer the enforcement responsibilities of OSHA or CWHSSA to UMTA; nor do we find that any OSHA enforcement responsibilities were transferred to the MRBA by the grant contract.
B & T'S CONTRACT
On reargument before a five judge panel of this Court, plaintiff alternatively asserts that, even if MRBA had no enforcement duty, B & T is independently responsible because they contractually agreed to undertake enforcement of OSHA. In support thereof, plaintiff cites the testimony of Randy Paisant and the terms of the contract between B & T and the MRBA.
As quoted earlier, Paisant responded that the MRBA placed a clause in the contract which directed the contractor to comply with OSHA. And, as we have determined, this was the extent of their obligation under the grant contract from UMTA. However, plaintiff quotes the following from Paisant’s testimony.
“Q. Was Barnard and Thomas obligated to make sure Landis complied with OSHA?
A. As far as I know, the joint venture was contracted to — not insured, but to make sure that the contractor complied with all the terms of the contract, which included a compliance for OSHA.”
Although that statement may be helpful in interpreting the B & T contract if there is ambiguity in that document, it alone is not determinative of the issue.
We have reviewed the specifics of the B & T contract and can find no language or provision suggestive of OSHA enforcement responsibilities. Plaintiffs main thrust appears to be reliance on the specifications of the Landis contract which require Landis to comply with OSHA. That is, plaintiff argues since the construction contract required Landis to comply with OSHA, and since B & T contracted to assure the building was built according to *1315 the plans and specifications, then they (B & T) had a duty to enforce OSHA on the jobsite.
We disagree. In Appendix A of the B & T contract, the description and scope of their (B & T’s) work is set out as follows:
“The Architect-Engineer Contractor shall develop, prepare and furnish contract plans and specifications to be used for competitive bidding for procurement and construction and for technical supervision of construction of all the work included in PHASE I of the Ferry Improvement Program of the Mississippi River Bridge Authority. ...”
The provisions of the contract make it clear that B & T’s obligation was to assure the MRBA that the building was constructed in accordance with the plans and specifications. It was B & T’s job to see to it that the MRBA got the building it contracted for. As a representative of the owner, B & T was not required to direct the contractor on safety procedures, or on how he should conduct his operations.
In Day v. National U.S. Radiator Corporation, 241 La. 288,128 So.2d 660 (1961), our Supreme Court discussed the duties of a consulting architect pursuant to its contract with the owner. In that case the court held that the architect’s duty to the owner “... was to see that before final acceptance of the work the plans and specifications had been complied with, that the proper materials had been used, and generally that the owner had secured the building it had contracted for.” Id. 128 So.2d at 666. The Court further noted that the architect had no duty to supervise the contractor’s method of doing the work, nor did they have control over the contractor’s method of performing his contract.
The B & T contract is clear and unambiguous with respect to their obligations and duties. We cannot find a duty to enforce OSHA in that contract, nor can we interpret it to include such a duty. Moreover, Section 5.03 of the Landis Construction contract specifically provides:
“Moreover, the undertaking of inspections by the engineers or authorized representative thereof shall not be construed as supervision of actual construction nor make the engineers or their authorized representatives responsible for providing a safe place or safe conditions for the performance or work under the contract by contractor, or contractors’ employees or those of the suppliers or subcontractors. ...”
This language is consistent with, and supportive of our interpretation that B & T had no contractual duty to enforce OSHA.
For the reasons assigned we reverse the lower court judgment and dismiss plaintiff’s suit.
REVERSED AND RENDERED.

. Landis, an original defendant in the suit, was dismissed via summary judgment holding Lan-dis to be immune from tort liability pursuant to the provisions of La.R.S. 23:1032 and 1061, et seq.

. The issue concerning Southern Insurance Company is whether it, or USF & G are the primary insurers of MRBA for this accident.

. The regulations promulgated pursuant to Section 107 of CWHSSA (40 U.S.C. § 333) were summarily adopted by the Secretary of Labor as part of OSHA regulations when that statute was adopted in 1970. See, Daniel International Corporation v. Occupational Safety and Health Review Commission, 656 F.2d 925 (4th Cir.1981).

. The other two industries, surplus and service contractors, were already subject to government regulations. Suppliers were covered by the Walsh-Healey Act of 1936, and service contractors by the McNamara-O’Hara Service Contracts Act.