LOUELLA MAY

VERSUS

REGIONAL TRANSIT
AUTHORITY, TRANSDEV
SERVICES, INC. AND
DONALD TUCKER

NO. 2019-CA-0510

COURT OF APPEAL

FOURTH CIRCUIT

STATE OF LOUISIANA

APPEAL FROM
CIVIL DISTRICT COURT, ORLEANS PARISH
NO. 2016-08271, DIVISION "C"
Honorable Sidney H. Cates, Judge
* * * * * *
**JUDGE SANDRA CABRINA JENKINS**
* * * * * *
(Court composed of Judge Edwin A. Lombard, Judge Sandra Cabrina Jenkins,
Judge Regina Bartholomew-Woods)

Anthony David Irpino
John Benjamin Avin
IRPINO LAW FIRM
2216 Magazine Street
New Orleans, LA 70130

COUNSEL FOR PLAINTIFF/APPELLEE

Michael J. Hall
Jonique Martin Hall
Law Office of Michael J. Hall, L.L.C.
1010 Common Street, Suite 2340
New Orleans, LA 70112

COUNSEL FOR DEFENDANT/APPELLANT

**JUDGMENT AMENDED, AFFIRMED AS AMENDED**

This appeal arises out of an automobile/bus collision that occurred on February 3, 2016, at the intersection of Gentilly Boulevard and New Orleans Street. After a two-day bench trial, the trial court rendered a judgment on January 31, 2019, in favor of plaintiff/appellee Louella May and against defendants/appellants Regional Transit Authority ("RTA"); Transdev Services, Inc. ("Transdev"); and Donald Tucker (collectively, "Appellants"). The trial court awarded Ms. May $560,000.00 in general damages; $106,733.00 for past medical expenses; and $298,575.00 for future medical expenses, together with judicial interest and costs. For the reasons expressed below, we amend the judgment and affirm as amended.

### FACTUAL AND PROCEDURAL BACKGROUND

On August 17, 2016, Ms. May filed a Petition for Damages against Mr. Tucker, RTA, and Transdev. She contends that RTA and Transdev were the employers of Mr. Tucker, and were the owners of the commercial tandem/double bus that Mr. Tucker was operating at the time of the accident.[1]

---

[1] Mr. Tucker testified that a tandem bus is essentially two buses joined together in the middle, and is about 60 feet long.

At the intersection of Gentilly Boulevard and New Orleans Street, there are two left turning lanes, an inner turning lane and an outer turning lane. The turning lanes are governed by a traffic light. Ms. May alleges that, on the morning of February 3, 2016, Mr. Tucker, in the course and scope of his employment by RTA and Transdev, was stopped in the right outer turning lane at the intersection of New Orleans Street and Gentilly Boulevard. The Petition asserts that when the traffic light turned green, Mr. Tucker turned left and, suddenly and without warning, merged into the left inner turning lane, colliding with Ms. May's vehicle.

Ms. May alleges that as a result of the Appellants' negligence, she suffered personal and bodily injuries, mental anguish and property damage. She contends that, although Mr. Tucker was driving the bus, RTA and Transdev are liable under the doctrines of respondeat superior, principal and agent, employer-employee, and/or master-servant.

On September 11 and 12, 2018, the trial court conducted a bench trial. On January 31, 2019, the trial court rendered a judgment in favor of Ms. May and against Mr. Tucker, and against RTA and Transdev, who were held vicariously liable for Mr. Tucker's negligence, in the total amount of $965,308.00. Appellants filed a timely suspensive appeal.

## DISCUSSION

Appellants list four assignments of error.

- The general damage award is in excess of the statutorily mandated amount as to political subdivisions of the state.

- The trial court erred in finding Mr. Tucker to be solely at fault in the February 3, 2016 accident.

- The trial court's general damages award is excessive.

- The trial court's award of future medicals is not supported by the medical testimony and evidence.

**The Accident**

Mr. Tucker testified that, on the morning of the February 3, 2016 accident, his bus was approaching the intersection of New Orleans Street and Gentilly Boulevard, which has two left turning lanes. He stated that both he and Ms. May were turning left onto New Orleans Street, with him being positioned in the outside turning lane and Ms. May in the inside turning lane.

He testified that as he was maneuvering from the right turning lane to the left turning lane, the light was red. He said that as he continued, the light changed to green, so he did not stop. He saw Ms. May's vehicle in the left lane only through his peripheral vision as he started making his turn. Mr. Tucker averred that he did not see the impact between his bus and Ms. May's car, and did not hear a crash sound. He did not even know that his bus had collided with Ms. May's vehicle. Mr. Tucker said that he is certain that he stayed in his lane as he made the left turn.

After the collision, Ms. May followed the bus in her car. About one-half mile past the intersection, she pulled in front of the bus, and flagged it down. When Mr. Tucker got out of the bus, he saw the damage to his bus on the panel in front of the rear wheel on the driver's side. He saw that Ms. May's vehicle was damaged in the right front, and the bumper was pulled away.

Ms. May testified that she was stopped in the left lane at the red light on Gentilly Boulevard, intending to make a left turn onto New Orleans Street when an RTA bus approached to her right. As the bus pulled up to her, the light changed to green, and the bus pulled off before she did. She said that while the bus was

3

turning, it veered into her lane and hit her. The back end of the bus caught her car's front bumper on the right side. After the impact, the bus dragged her vehicle by the bumper. Ms. May said she followed the bus and flagged it down. She told Mr. Tucker that the RTA bus had struck her car, and he exited the bus and looked at the damage.

**Ms. May's Damages**

Ms. May's medical history reflects that in the 1980s, she suffered injuries to her neck and shoulders when a ceiling fell on her head at work. She underwent treatment for two months, and her injuries resolved. She testified that immediately before the bus accident, she did not have any significant or ongoing physical problems with her back, neck, shoulders, or legs. She stated that she was fairly active, tending to her garden, walking her dog, doing household chores, and working as a sitter for the elderly. Since the accident, Ms. May said that she experiences back pain daily, and has been limited in her overall activities. She no longer works, although she has not been told not to work by any treating physician.

Ms. May's son, Marlin May, testified at trial, and corroborated Ms. May's testimony regarding her pre- and post-accident physical abilities and limitations. Mr. May testified that his mother is "a lot slower" after the accident, and she works and moves significantly less. He observed that she needs multiple heating pads to sleep, she complains that when she wakes up her legs are tingling, and she must constantly use over-the-counter medications to treat her pain.

The evidence at trial showed that Ms. May first sought treatment at Total Body Chiropractic from February 10, 2016 to November 27, 2017. She complained of neck pain and mid to lower back pain. Ms. May was treated conservatively, and her lower back pain persisted.

4

Total Body Chiropractic referred Ms. May for a lumbar MRI. The MRI revealed a 6.6 mm herniation and annular tear at L5-S1, disc bulging at L4-5, and facet hypertrophy at L3-4, L4-5, and L5-S1. Because of the MRI results and the continued pain in her back, Ms. May was referred to Dr. Rand Voorhies, a neurosurgeon at Southern Brain and Spine. Although Dr. Voorhies did not testify at trial, certified medical records reflecting his treatment of Ms. May were entered into evidence by stipulation.

Ms. May first began treatment with Dr. Voorhies on June 28, 2016. At her initial visit and after a physical examination, Dr. Voorhies reviewed the MRI films, and confirmed the MRI findings. Dr. Voorhies ordered additional diagnostic testing, including an EMG study, SPECT scan, CT scan, X-rays, and diagnostic nerve blocks. Based on Dr. Voorhies' interpretation of the results of Ms. May's diagnostic testing and symptoms, Dr. Voorhies opined that Ms. May's symptoms stemmed from her facet joints. Dr. Voorhies recommended that Ms. May undergo a lumbar epidural steroid injection and facet blocks. Dr. Voorhies also opined that Ms. May was a candidate for lumbar fusion surgery at the L3-4 level to address her ongoing facet problem. Ms. May, however, told Dr. Voorhies that she did not want to undergo surgery. To avoid surgery, Dr. Voorhies referred Ms. May to Dr. Eric Lonseth for pain management and interventional care.

Dr. Eric Lonseth, Ms. May's pain management physician, provided testimony by video deposition, which was admitted into evidence. Dr. Lonseth began treating Ms. May in December 2016. Dr. Lonseth performed several injection procedures, including a lumbar epidural steroid injection, and bilateral lumbar medial branch blocks. On June 29, 2017, Dr. Lonseth performed a bilateral

rhizotomy procedure at L3, L4, and L5, which was repeated on April 12, 2018.[2] These procedures gave Ms. May relief for a longer duration of time. Dr. Lonseth opined that Ms. May would need one lumbar rhizotomy every nine months for the next seven years to address her ongoing back complaints.

At trial, Appellants called Dr. Chad Domangue, a pain management physician. Dr. Domangue testified that he saw Ms. May once on October 19, 2017 for an independent medical exam. Although Dr. Domangue stated that there was no objective damage to Ms. May's disc or bones, he did find that she suffered from facet syndrome,[3] which was caused by the February 3, 2016 bus crash. Dr. Domangue also testified that the rhizotomies that Ms. May underwent were necessitated by the accident. Dr. Domangue recommended that Ms. May undergo an endoscopic rhizotomy, which he described as a surgery to destroy more of the nerve and give Ms. May relief for a longer period of time.

### La. R.S. 13:5106(B): Statutory Cap on General Damages Against Political Subdivisions

The trial court awarded Ms. May general damages in the amount of $560,000.00 against Appellants. In their first assignment of error, Appellants contend that, given RTA's status as a political subdivision of the state, the amount of the award of general damages against RTA is statutorily limited to $500,000.00. Appellants rely on La. R.S. 13:5106(B), which provides:

> The total liability of the state and political subdivisions for all damages for personal injury to any one person, including all claims and derivative claims, exclusive of property damages, medical care and related benefits and loss of earnings, and loss of future earnings as

---

[2] A rhizotomy is an operation which involves the cutting of anterior or posterior spinal nerve roots for therapeutic purposes. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1948 (1993).

[3] According to one medical source, facet syndrome occurs when the joint of the vertebra below rides too high on the joint of the vertebra above, and encroaches into the opening where the nerve lies. *DeGruy v. Pala, Inc.*, 525 So.2d 1124, 1129 n.4 (La. App. 1st Cir. 1988).

provided in this Section, shall not exceed five hundred thousand dollars, regardless of the number of suits filed or claims made for the personal injury to that person.

In 1979, the Louisiana legislature created the RTA as a political subdivision of the State. This act is codified in La. R.S. 48:1654(A):

> There is hereby created, the Regional Transit Authority, subject to the conditions hereinafter set forth, which shall be a body politic and corporate and political subdivision of the State of Louisiana. . . .

The $560,000.00 in general damages assessed against RTA, a political subdivision of the state, exceed the $500,000.00 statutory cap. We, therefore, limit the general damages award against RTA to $500,000.00.

Ms. May contends that defendant Transdev is not subject to the statutory cap in La. R.S. 13:5106(B) to reduce its liability because the record is silent as to whether Transdev is a "political subdivision" of the state. Appellants assert that Transdev is a political subdivision under La. R.S. 13:5102(B)(2), which provides as follows:

> (2) Any private entity, such as Transit Management of Southeast Louisiana, Inc. (TMSEL), including its employees, which on the behalf of a public transit authority was created as a result of Section 13(c) of the Urban Mass Transportation Act, requiring the terms of transit workers' collective bargaining agreements to be honored and provides management and administrative duties of such agency or authority and such entity is employed by no other agency or authority, whether public or private.

We agree with Ms. May that there is no evidence in the record that Transdev was "created as a result of Section 13(c) of the Urban Mass Transportation Act [UMTA"]."[4] Transdev, therefore, cannot limit its liability to Ms. May based on the statutory cap set forth in La. R.S. 13:5106(B).

_____

[4] The UMTA was passed in 1964. Its purpose was to "assist in the development of improved mass transportation facilities, and to provide assistance to State and local governments in the

**Allocation of Fault**

Appellants contend that the trial court erred in allocating 100 percent of the fault to Mr. Tucker. "A trial court's findings regarding percentages of fault are factual, and will not be disturbed on appeal unless clearly wrong." *Magri v. Jazz Casino Co.*, 19-0064, p. 9 (La. App. 4 Cir. 6/26/19), 275 So.3d 352, 359.

Mr. Tucker testified about the heightened duties and responsibilities of drivers/operators of buses, including tandem buses. Louisiana's CDL Manual requires drivers to check mirrors on a more than regular basis when making turns, and make certain that the rear of the bus will not strike anything when making wide turns. In spite of these heightened duties, Mr. Tucker did not see the crash, and did not know that he hit Ms. May's vehicle while he was making his left turn from the right outer lane. It wasn't until Ms. May flagged him down one-half mile after the collision that Mr. Tucker became aware that the bus had struck Ms. May's vehicle.

There was insufficient evidence introduced at trial that would warrant the allocation of any fault to Ms. May. Based on the record evidence, we find that the trial court was not manifestly erroneous in attributing 100 percent of the fault to Mr. Tucker.

**General Damages Award**

Appellants contend that the trial court's award of $560,000.00 in general damages is excessive, and out of proportion to general damage awards seen in similar cases.

---

financing of those systems." *Walters v. Landis Constr. Co.*, 522 So.2d 1306, 1310 (La. App. 4th Cir. 1988 (citing 49 U.S.C. § 1601).

"General damage awards are reviewed under an abuse of discretion standard because the trier of fact is the best position to evaluate witness credibility and see the evidence firsthand." *Antippas v. Noel Hotel Group, LLC*, 17-0798, pp. 15-16 (La. App. 4 Cir. 2/27/19), 265 So.3d 1212, 1223. "'An appellate court may not overturn an award for general damages unless it is so out of proportion to the injury that it shocks the conscience.'" *Id.* (quoting *Lee v. Lu*, 05-899, p. 9 (La. App. 5 Cir. 4/11/06), 931 So.2d 365, 371). "Consideration of prior awards to determine whether a judgment . . . is excessively high is only appropriate after the appellate court has determined that an abuse of discretion has occurred." *Urquart v. Spencer*, 17-0069, 17-0202, 17-0203, p. 14 (La. App. 4 Cir. 7/27/17), 224 So.3d 1022, 1032.

At trial, Ms. May testified about how serious her injuries have been and still are as a result of the crash, particularly with respect to her back. Ms. May says she has continued throbbing, pain, and burning in her back and/or running down her legs every day. She testified that she no longer does many of the activities she did before the accident, including working as a sitter, traveling with family, gardening, fishing, and exercising regularly. She was required to undergo a lumber rhizotomy, which involves the cutting of spinal nerve roots. There was testimony that the rhizotomies must continue every nine months for at least the next seven years, which the trial court found to be "most compelling."

In reviewing the entire record, including the reasons for judgment, it is apparent that the trial judge was clearly favorably impressed with the credibility of Ms. May's experts and of Ms. May regarding the extent of her physical injuries, pain, and suffering, and her physical limitations. Given the vast discretion of the trial court in assessing general damages, we find no abuse of discretion.

9

Accordingly, we need not resort to an examination of prior awards. This assignment of error is without merit.

**Future Medical Expenses**

Appellants contend that the trial court's award of $298,575.99 in future medical expenses is excessive and not supported by the evidence and testimony submitted at trial. "Unlike past medical expenses which can be verified by both bills and testimony, future medical expense awards are 'in great measure highly speculative and not susceptible to calculation with mathematical certainty.'" *Antippas*, 17-0798, p. 13, 265 So.3d at 1221 (quoting *Menard v. Lafayette Ins. Co.*, 09-1869, p. 13 (La. 3/16/10), 31 So.3d 996, 1006). "A plaintiff is required to establish that future expenses will, more probably than not, be medically necessary." *Id*. "Future medical expenses must be established with some degree of certainty, including supporting medical testimony and estimations of the probable cost of the medical expenses." *Id*.

Every medical witness, including Appellants' IME physician, Dr. Domangue, testified that Ms. May needed future medical treatment. Dr. Lonseth's medical report, which was admitted into evidence, set forth his expert medical opinion that Ms. May will need one lumbar rhizotomy every nine months for the next seven years to address her ongoing back complaints. Dr. Lonseth's written report was confirmed by his trial testimony, in which he testified that Ms. May will need this recommended treatment.

Moreover, Ms. May's economic expert, Dr. G. Randolph Rice, performed a forensic calculation of Dr. Lonseth's recommendations using the facility estimates, and determined that Ms. May's future medical expenses would total $298,575.00. "The effect and weight to be given to medical expert testimony is within the broad

10

discretion of the factfinder, who may accept or reject, in whole or in part, the opinions expressed by an expert." *Antippas*, 17-0798, p. 13, 265 So.3d at 1221. The trial court awarded the exact amount of future medical expenses recommended by Ms. May's economic expert, Dr. Rice. Appellant did not present countervailing experts. The trial court clearly found Dr. Rice's testimony compelling. Based upon Dr. Lonseth's testimony as to the procedures Ms. May will need in the future, and Dr. Rice's estimation of the cost of those procedures, we find that the award of future medical expenses is supported by the record, and, therefore, not excessive, when viewed in the light most favorable to Ms. May. We find no abuse of discretion.

## CONCLUSION

For the foregoing reasons, we amend the judgment to limit the trial court's award of general damages against RTA to $500,000.00, pursuant to La. R.S. 13:5106(B), which limits the liability of political subdivisions of the state. We find that Transdev, which was also cast in judgment, is not entitled to invoke the statutory cap on general damages because there is no evidence that Transdev is a political subdivision pursuant to La. R.S. 13:5102(B)(2). In all other respects, we affirm the trial court's January 31, 2019 judgment.

**JUDGMENT AMENDED, AFFIRMED AS AMENDED**

11